UNITED PRESS ASS'N v. NATIONAL NEWSPAPER·ASS'N.*

(Circuit Court of Appeals,. Eighth Circuit. November 2, 1916.)

No. 4638.

1. CONTRACTS ⬡324(2)—RENUNCIATION—REMEDY OF INJURED PARTY.
   Where one party repudiates a continuing contract, the injured party may (1) treat the contract as rescinded and recover on a quantum meruit so far as he has performed; or (2) keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract sue and recover under the contract; or (3) he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue to recover so far as he has performed, and for the profits he would have realized, if he had not been prevented from performing.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1551–1557; Dec. Dig. ⬡324(2).]

2. CONTRACTS ⬡313(2)—RENUNCIATION—REMEDY OF INJURED PARTY.
   Defendant, a newspaper publisher, contracted with plaintiff for news service for a term of years, to be paid for weekly in advance. Before expiration of the term defendant notified plaintiff that it would no longer perform, but desired to continue a part of the service contracted for. Held, that the fact that plaintiff continued performance for another month, while the parties were negotiating, although it received no payments, did not preclude it from then treating the contract as ended because of defendant's refusal to perform.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279; Dec. Dig. ⬡313(2).]

3. CONTRACTS ⬡313(2)—RENUNCIATION—REMEDY OF INJURED PARTY.
   At the expiration of a month plaintiff notified defendant that, unless arrearages were paid within three days, it would consider the default as a breach, and proceed to collect the amount then owing for service rendered, "and the damages accruing to us on account of the failure on your part to carry out the contract." Held, that such notice was not to be construed as referring alone to the nonpayment of installments, but to defendant's refusal generally to perform, and that plaintiff was entitled to recover, not only the installments due up to that time, but also for loss of future profits.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279; Dec. Dig. ⬡313(2).]

———————

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied January 10, 1917.

In Error to the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Action at law by the United Press Association against the National Newspaper Association. Judgment for plaintiff, from which it brings error. Reversed.

For opinion below, see 227 Fed. 193.

G. B. Arnold, of St. Louis, Mo. (Tyson Dines, Jr., of Denver, Colo., and J. W. Curts, of Cincinnati, Ohio, on the brief), for plaintiff in error.

Frank M. Lowe, of Kansas City, Mo. (John T. Bottom, of Denver, Colo., on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

CARLAND, Circuit Judge. Plaintiff in error, hereinafter called plaintiff, brought this action against the defendant in error, hereinafter called defendant, to recover the sum of $875, due on a contract executed between the parties November 1, 1909, and for loss of future profits by reason of the wrongful refusal of the defendant to further perform the same. The cause was tried to the court, and findings of fact and conclusions of law were made. The defendant in its answer admitted the making of the contract, but denied that it ever refused to perform the same, and also alleged that the plaintiff on its part wholly failed and refused to perform the contract. The answer also tendered the sum of $875 as payment in full for all day and Saturday night reports furnished defendant for the weeks ending February 11, February 18, February 25, March 4, and March 11, 1911, and paid said sum into court.

A large amount of evidence was taken as to whether the plaintiff had furnished the defendant with reliable and authentic news. Just upon what theory this evidence was taken does not appear, as the answer of the defendant did not allege that it refused to perform the contract and was justified in so doing; but as the court did not deem it necessary to make any finding upon this issue, and as the defendant did not sue out a writ of error, and now makes no complaint of the failure to so find, the whole question may be dismissed from further consideration. The court found the facts substantially as follows:

Plaintiff and defendant entered into a contract November 1, 1909, by the terms of which plaintiff was to deliver to defendant for a period of five years ending November 1, 1914, its full day and Saturday night reports, and to receive as compensation therefor $150 per week for the first 12 months and $175 per week thereafter weekly in advance, and in addition thereto defendant was to furnish plaintiff with the local news within 25 miles of the office of its newspaper, the Kansas City Post, and to provide a suitable office for plaintiff's operator. While the contract was being performed by both parties, except as to the nonpayment of certain weekly installments by the defendant on February 7, 1911, F. G. Bonfils, president of defendant, sent a telegram to plaintiff reading as follows:

"Kansas City, Mo., Feb. 7.

"C. D. Lee. We desire to notify you that we do not find the United Press service satisfactory nor according to your representations to us. You will therefore discontinue the daily service after this week. We would like to contract with you for your Saturday night service alone. F. G. Bonfils, The Kansas City Post. 4:20 P."

In reply thereto plaintiff sent the following telegram:

"Paid       Night Letter              New York, February 7, 1911.

"F. G. Bonfils, The Kansas City Post, Kansas City, Missouri. Your telegram received. In view of the fact that we have received no intimation that service was unsatisfactory or in any respect not in keeping with our representations we feel that your contract obligations should be fulfilled. You have always used our service liberally and there is every indication of its value to the Post. We have entered into other arrangements and made binding arrangements based upon our contract with the Post, and such an outcome would represent a serious loss to the United Press.                    C. D. Lee."

On February 11, 1911, defendant, by its president, F. G. Bonfils, wrote the following letter to plaintiff:

"W. F. Lochridge, Agent, United Press Ass'n, Office—Dear Sir: We are in receipt of two telegrams from Mr. C. D. Lee, first vice president of your company, touching the matter of the discontinuance of the day service under contract made with your company in November, 1909, and we have this to say:

"First. We have no disposition to do anything harsh in reference to this matter. We simply are determined not to continue the day service, and if, in the discontinuance of that service, your company will refuse to supply us with the night service, then in that case we will discontinue both day and night service, for the reason that the day service has not been satisfactory. The terms of the contract on the part of your company have not been complied with, and, for that reason, we are determined to discontinue that portion of the service.

"Second. We are perfectly willing to let you remain and occupy the space you now have, and to furnish you with such news items as you may desire to use, provided your company will discontinue the day service and furnish us with the night service, so that there will be no unpleasant relationship existing between our office and yourself.

"Third. If, however, your company refuses to discontinue the day service, and refuses to let us have the night service as we have requested, then and in that case, by virtue of your own act, it will become necessary for you to remove your bureau from our building and seek a location elsewhere. It will, therefore, be a matter for you to determine, and the result will depend upon your own actions.

"We request a definite and positive answer, and would ask that you take time to obtain such answer in full from your company, and, until that time, the matter will be left open.

"Very truly yours,                    [Signed]   F. G. Bonfils."

February 14, 1911, plaintiff wrote defendant as follows:

"United Press Association,

"New York City, February 14th, 1911.

"Mr. F. G. Bonfils, The Kansas City Post, Kansas City, Missouri—Dear Mr. Bonfils: Your letter of February 11th, addressed to W. F. Lochridge, agent of the United Press at Kansas City, has been forwarded to this office. Its receipt is hereby duly acknowledged.

"In the first place, I am very frank to say that the first notification of your desire to alter the terms of our agreement providing for the delivery of our day and Saturday night reports, and for office room and news facilities at Kansas City, was a great surprise to me, particularly in view of the fact that this came in the form of an order to discontinue service of the day report,

without the giving of any reason beyond the general statement in a second communication, that the service was not satisfactory.

"When I was in Kansas City a week or so ago, Mr. Charles Bonfils told me that the Post was under the necessity of effecting economies, and that, while he had no fault to find with the United Press, he thought that he would give up our service if it could be done, but that he knew nothing about your contract obligations. In view of the fact that we have served the Post for over a year with both the day and Saturday night reports, and have had every reason to believe that service was not only satisfactory, but very useful, your complaint that it is not, now satisfactory, taken in connection with the plea of Mr. Charles Bonfils that economies were necessary, strikes us as not being entirely apropos.

"It strikes us as being still more inconsistent that, while complaining that the day service is unsatisfacory, you want to continue our Saturday night service; this in view of the fact that the United Press has established a first-class reputation as an afternoon news service association. If we are entitled to news facilities and bureau room in your office and to continue the Saturday night service, we do not see why the agreement should not be carried out in its entirety, as all of these matters are covered by and contained in the same agreement, which agreement names a joint rate to be paid for both services.

"The United Press entered into its agreement with the Post in good faith, and furthermore, believing that mutual considerations, as well as the strict letter of the contract, would lead both of us to carry out the full term of the contract, we established a bureau in Kansas City and entered into contracts with other papers to provide service from that point. Your failure to carry out the agreement in its entirety does not only mean a considerable financial loss to us, as well as a loss in a news way, but would undoubtedly force litigations upon us by papers with whom we have made contracts based upon our agreement with the Post, and all made in good faith.

"Under the circumstances, we do not feel justified in altering the terms of our agreement under date of November 1, 1909, and in taking this view of the matter we feel that we are working no hardship on the Post, as we believe that our service is in many respects one of your most valuable assets. The United Press is recognized as one of the leading press associations of the country, having a larger afternoon clientele than any other press association. We are spending large sums of money on our service, and these expenditures aggregate nearly $100,000 a year more than they did when we made our contract with the Post, and the service will, we believe, be increasingly valuable to all clients.

"Aside from our reputation as a first-class news-gathering concern, our chief asset is the contracts we have made and are making with newspapers, and since we always hold ourselves in readiness to carry out our part of these agreements, and unless there are just reasons to the contrary, we feel that our clients should do likewise.

"If you can suggest some more equitable adjustment of the matter, we will, of course, be pleased to give it every consideration.          Yours very truly,
"CDL—TJB                                           [Signed]   C. D. Lee."

On March 10, 1911, plaintiff delivered to defendant the following notice:

"Kansas City, Mo., March 10, 1911.

"The National Newspaper Association, Publishers Kansas City Post, Kansas City, Missouri—Gentlemen: We call attention to the following clause of your contract:

" 'Second. The second party agrees to receive and accept said news reports (publishing such parts, thereof as it may desire) and pay without deduction to the first party, at its New York office, during the term of this agreement, and any extension thereof, the sum of $150 per week for the first 12 months, and $175 per week thereafter, weekly in advance.'

"We note that you are now five weeks ($875.00) in arrears, week ending March 11th, and we notify you that unless arrearages are paid up, and your weekly payments in advance begun on March 13th, 1911, we will consider your default as a breach by you of the contract, and will proceed to collect

the amount then owing for service actually rendered, and the damages accruing to us on account of the failure on your part to carry out the contract. Arrearages may be tendered to the undersigned officer of the United Press, at the Baltimore Hotel, Kansas City, Mo., or to the Kansas City manager.

"United Press Association,

"[Signed]  C. D. Lee, President,

"General Offices, World Building, New York, N. Y."

On the same day plaintiff received from defendant the following telegram:

"Baltimore Hotel, Mar. 10, 1911, Kansas City, Mo.

"C. D. Lee, Baltimore Hotel, K. C., Mo.

"Mr. Bonfils who made deal with you is at Lankershim Hotel Los Angeles he will be back in two weeks if you cannot wait his return start your threat and I assure you there will be no mercy asked.

"H. H. Tammen      433 P."

Whereupon plaintiff sent the following telegram to the defendant:

"Kansas City, Mo., March 10, 1911.

"F. G. Bonfils, Hotel Lankershim, Los Angeles, Calif.

"Results posts withholding payments for service notice served here today unless arrearages paid by tomorrow both our reports be discontinued and immediate action taken, enforce contract following adjustment suggested to Charles Bonfils. Will continue Saturday night service twenty-five per week and accept weekly payment sixty eight dollars as equity in day service this save you eighty two per week unless adjusted tomorrow compelled proceed as above.      C. D. Lee, Hotel Baltimore."

Plaintiff also on the same day submitted the following proposition to defendant:

"Kansas City, Mo., March 10, 1911.

F. G. Bonfils, President, The National Newspapers Ass'n, The Kansas City Post, Kansas City, Mo.—Dear Sir: In view of the fact that you have expressed the desire, for reasons of economy, to discontinue our day leased wire service, but wish to continue the Saturday night report, both of these reports having been contracted for by you, under an agreement dated November 1, 1909, we hereby submit the following modifications to the above-named agreement:

"First. We will continue our Saturday night leased wire service as per terms of our agreement, accepting for same, the weekly payment of $25.00 (twenty-five dollars).

"Second. We will discontinue our day leased wire service, accepting in lieu of the $150.00 per week (which was the rate charged for this service) $68.00 (sixty-eight dollars) per week, our cash equity in the day service, for the remainder of the term of the agreement.  This rate to become effective upon the acceptance of this supplemental agreement.

"Third. The above modifications to the original agreement are not to be construed as invalidating any other features of that agreement and right of the United Press to the local news of the Kansas City Post in particular.

"United Press Associations."

After waiting three days for a reply from defendant as to the notice and proposition served on March 10, 1911, plaintiff discontinued all service under the contract and closed up its office used in connection with such service.  From February 7, 1911, to March 13, 1911, plaintiff continued to furnish the service agreed to be furnished by it, and the defendant continued to receive and use part of the same, but did not pay therefor.  Defendant during said time furnished plaintiff with the local news as provided in the contract.  Upon these facts the trial court declared the law to be as follows:

"1. The court declares the law to be that, while plaintiff had a right to discontinue the service for nonpayment of weekly installments in advance, yet under the law the failure of defendant to pay such weekly installments in advance does not authorize plaintiff to recover more than for the services actually performed.

"2. The court declares the law to be that, while under the contract defendant was bound to pay for the services obtained from plaintiff weekly in advance, yet when plaintiff continued to deliver its service to defendant without exacting and requiring said payments in advance, it in law waived the payment in advance, and plaintiff could not exact of defendant such waived payments as a condition precedent to the continuing of future service.

"3. The court declares the law to be that in this case, while the telegram sent by defendant on the 7th day of February, 1911, to plaintiff, directing and requesting plaintiff to discontinue the day service to it on and after February 11, 1911, was a sufficient notice in law to have justified plaintiff in discontinuing such service, and if such service had been discontinued at that time would have relieved plaintiff from any further obligation under the contract to continue such service, and under the law plaintiff would have been entitled to recover all damages it sustained by reason of the failure of defendant to comply with the terms of the contract; but under the evidence in this case such service was not discontinued, but was sent by plaintiff and received and used by defendant, until the plaintiff, because of nonpayment of weekly installments, discontinued the service both day and night, abandoned its bureau, and canceled the contract, therefore under the law said telegram did not terminate the contract, and plaintiff can recover only for such service as was actually rendered."

These conclusions of law were each excepted to at the proper time by counsel for the plaintiff. Counsel also excepted to the findings of fact and law, because the court failed to find, in accordance with the evidence, that plaintiff treated the contract at an end, by reason of the communications contained in defendant's telegram of February 7th, the letter to Mr. Lochridge, agent of the plaintiff, and the telegram of March 10th, from Mr. Tammen, a part owner of the Kansas City Post, as well as on the ground of the nonpayment of weekly installments. Judgment was thereupon rendered for the plaintiff against the defendant for the amount of the installments due under the contract at the time the plaintiff discontinued its service, but no recovery was allowed for the profits which the plaintiff would have received, had the contract continued to be performed until it expired by its terms.

Plaintiff has brought the case here, claiming that under the facts and law he was entitled to recover for future profits. The trial court separated the case made by the plaintiff into two divisions. In regard to the renunciation of the contract by the defendant, it decided that, if the plaintiff had accepted the renunciation when it was made, then the plaintiff could have recovered the amount due for installments under the contract to the time of the breach thereof by the defendant, and also for future profits, but that the plaintiff did not accept the renunciation, but continued to furnish the service which it had agreed to furnish under the contract down to March 13, 1911, a period of over one month, and that by so doing the plaintiff waived its rights to treat the contract as broken by the defendant. This division of the case being thus disposed of, the court proceeded to consider the demand and notice made by the plaintiff on March 10, 1911. As to this it held there could be no right on the part of the plaintiff to discontinue

service under the contract by reason of installments which had already accrued, as the plaintiff by its mode of dealing had waived, as to these installments, the provision of the contract that they should be paid weekly in advance. In regard to the installment which was to become due on March 11, 1910, and which the evidence showed the defendant did not pay, the court held that the agreement in the contract to pay these weekly installments in advance was an independent covenant. In other words, that it did not go to the root of the contract, and therefore a failure to pay in advance, although insisted upon by the plaintiff, was not such a breach of the contract as would allow the plaintiff to recover future profits; that if the plaintiff chose to discontinue service under the contract for the nonpayment of the installment due March 11, 1911, it could do so, but could only recover the installments already earned under the contract.

[1] We hardly think that the trial court was justified in dividing up the plaintiff's case in the manner stated. It is well settled that where one party repudiates a contract, and refuses longer to be bound by it, the injured party has an election to pursue one of three remedies: First, he may treat the contract as rescinded, and recover upon quantum meruit so far as he has performed; second, or he may keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract for performance sue and recover under the contract; third, or he may treat the repudiation as putting an end to the contract for all purposes of performance and sue to recover so far as he has performed, and for the profits he would have realized if he had not been prevented from performing. 6 R. C. L. § 389. There is no difference in the law as to the measure of recovery between anticipatory breaches before the time of the performance of the contract arrives and a refusal to further perform during the performance of a contract, except that the injured party may recover so far as he has performed. The law as to anticipatory breaches is well settled by Roehn v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953.

The plaintiff in this case, so far as the form of the action is concerned, elected to pursue the remedy described under subdivision 3 above mentioned. On this state of the record three questions arise for decision: First. Did the conduct of the plaintiff subsequent to February 7, 1911, deprive it of the right of treating the repudiation of the contract by the defendant as putting an end to the contract for all purposes of performance? Second. Did the plaintiff, by the notice of March 10, 1911, restrict its complaint to the failure of the defendant to pay the installments due under the contract, so as to waive all other complaint, or was that notice when properly construed a general complaint, because defendant had refused to carry out the contract? Third. Is the plaintiff to be limited to a complaint for nonpayment of installments, or should the nonpayment of installments be considered with all the other evidence in the case as to whether the defendant refused to perform the contract?

[2] As to the first proposition, it must be borne in mind that the

defendant never at any time retracted what was stated in the telegram of February 7th, the letter of February 11th, or the Tammen telegram of March 10, 1911. The evidence shows that the defendant intended, if it was possible, to end the contract, and its president so testified. It never by declaration or act changed its position after sending the telegrams and letter above mentioned. To act on the refusal of the defendant to perform the contract so far as the rights of the defendant were concerned, leaving out of consideration for the present the effect, if any, that the notice of March 11, 1911, would have upon the same, was the same on March 10, 1911, as it was on February 7 or 11, 1911. The defendant had not placed itself in any different position than it occupied on those dates. So far as the present record is concerned, the refusal of the defendant to perform the contract was without justification or excuse. It now remains to be seen if, under such conditions, the attempt of the plaintiff for about a month to try and get the defendant to perform the contract deprives it of its right to treat the persistent refusal of the defendant to perform it as ending the contract. It is true that the conduct of the plaintiff during the period from February 7 and 11, 1911, to March 10, 1911, kept the contract open for both parties. The defendant could have withdrawn its renunciation, either by an express declaration or by acts inconsistent therewith. It, however, said nothing, and the evidence shows that it was its intention to do nothing, towards continuing the contract. It is true that the plaintiff continued to furnish the service, but the defendant refused to pay for the same, which was the substantial consideration for the contract on the part of the plaintiff. We are of the opinion that on March 13, 1911, it was open to the plaintiff to treat the contract as ended on account of the refusal to substantially perform the same by the defendant.

[3] It now remains to be seen whether, by the giving of the notice of March 10, 1911, the plaintiff abandoned its right to treat the contract at an end because of the renunciation of the defendant, and limited its complaint simply to the nonpayment of the installments due. It will be observed that the notice of March 10, 1911, did not say anything about whether the plaintiff intended to treat the contract as at an end by reason of the refusal of the defendant to perform it. The evidence shows that the plaintiff, when it discontinued the service on March 13th, discontinued it both on the ground that the installments were not paid and that the defendant had refused in their communications to perform the contract. The notice of March 10, 1911, stated that, if the defendant did not pay the arrears due for installments and for the week commencing March 11, 1911, it would consider the defendant in default for the nonpayment of the installments, and such nonpayment as a breach of the contract, and that the plaintiff would proceed to collect the amount then due for service actually rendered and the damages accruing on account of the failure of defendant to carry out the contract. Now, in view of all the evidence in the case, there is no reason for limiting the words "failure on your part to carry out the contract" as referring alone to the nonpayment of installments, as the notice specifies two kinds of damages: One, a re-

covery of the amount due for unpaid installments; and the other to damages accruing on account of the failure of the defendant to carry out its contract. The telegram to Bonfils at Los Angeles was but a repetition of the notice. We do not think the plaintiff on this record is estopped from contending now that it discontinued its service and treated the contract at an end by reason of the defendant's refusal generally to perform the contract.

As to the third question we do not think it is fair to restrict the plaintiff as to its right to treat the contract at an end to the refusal of the defendant to pay the weekly installments in advance, but that the refusal to pay such installments should be considered with all the other evidence in the case, and, when so considered, we are of the opinion that the plaintiff had the right to treat the contract at an end, and did so treat it on March 13, 1911, for a general refusal on the part of the defendant to substantially perform it. We think it is a fair deduction from the evidence that the refusal to pay the installments was a part of the general intention and plan of the defendant to refuse performance of the contract. In this view of the case we find it unnecessary to consider whether the refusal of the defendant to pay the installment due March 11, 1911, standing alone, would entitle the plaintiff to treat the contract at an end and recover the installments due and future profits.

It is claimed by counsel for defendant that the case of Star Chronicle Pub. Co. v. United Press Association, 204 Fed. 217, 122 C. C. A. 489, is conclusive as to the rights of the defendant in this case. We cannot see how it has any bearing whatever. It was decided in that case that there had been no termination of the contract by the Star Chronicle Company. Whether the contract in the case cited had been terminated depended upon an oral conversation which took place between the manager of the Chronicle Company and the operator of the United Press, and also upon a letter of July 5, 1910, sent by the defendant in that case to the plaintiff. The Court of Appeals decided that the conversation and letter, even if the letter had been received, did not amount to a termination of the contract. The evidence is entirely different in the case at bar.

Judgment reversed, and a new trial ordered.