### W. H. EDGAR & SON v. GROCERS' WHOLESALE CO. *

(Circuit Court of Appeals, Eighth Circuit. April 7, 1924. Rehearing Denied July 9, 1924.)

No. 6382.

1. Sales ⟜85(2)—Fluctuation in price of commodity held not to render performance of contract "commercially impracticable."

Under a contract for sale of sugar to a wholesale grocery company, made at a time when the price was abnormally high and subject to wide fluctuations, a provision that the contract was "subject to strikes, fires, transportation and business conditions, and other extraneous causes which render performance commercially impracticable" did not justify the buyer in refusing to accept shipment because of a drop in the market price of three cents a pound, where it continued to buy sugar from others and sell in the ordinary course of its business.

2. Sales ⟜384(4)—On breach of contract, duty of other party to minimize damages.

On absolute repudiation of a contract by the buyer before performance, it is the duty of the seller to minimize its damages from the breach, and where the sale was of a commodity, such as sugar, as readily marketable at point of shipment as at distination, it is not justified in making shipment and incurring large expense for transportation and storage, and is not entitled to recover such unnecessary expense as part of its damages.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*For opinion denying rehearing see 1 Fed. (2d) —.

Action at law by W. H. Edgar & Son against the Grocers' Wholesale Company. Judgment for defendant, and plaintiff brings error. Reversed, and case remanded.

H. E. Spalding, of Detroit, Mich. (William L. Carpenter, of detroit, Mich., and W. E. Miller, of Des Moines, Iowa, on the brief), for plaintiff in error.

Harley H. Stipp, Eugene D. Perry, Robert J. Bannister, Vincent Starzinger, and Fred A. Little, all of Des Moines, Iowa, for defendant in error.

Before LEWIS, Circuit Judge, and SYMES and PHILLIPS, District Judges.

SYMES, District Judge. A stipulation of facts was introduced at the trial of this case, from which it appears: That Edgar & Son, the plaintiff here and below, is a copartnership located in Detroit, Mich. That after some negotiations plaintiff prepared a contract, dated June 9, 1920, and forwarded it to the Grocers' Wholesale Company, defendant here and below, at Des Moines, Iowa. The latter signed and returned it to the plaintiff, who thereupon duly executed it. This contract witnessed the sale by Edgar & Son to the Grocers' Company of 3,600 bags of granulated sugar at the price of $25.50 per 100 pounds, f. o. b. New Orleans; 1,800 bags to be shipped promptly and 1,800 bags in August following. It also contained this clause, which is the subject of this controversy:

"All contracts subject to strikes, fires, transportation and business conditions, and other extraneous causes which render performance commercially impracticable."

Plaintiff shipped to the defendant the first installment of 1,800 bags, which the defendant accepted and paid for. Thereafter certain correspondence by letter and telegram took place between the parties, from which it appears that on July 30, 1920, the defendant wrote to plaintiff at Detroit and requested a cancellation of the contract on account of business conditions, stating that there was a great quantity of sugar in the state of Iowa and a poor demand. This request was refused. Thereafter, in other letters and telegrams between the parties, the defendant stated it would not accept any more sugar, and declared unequivocally that it would not accept any, if shipped. The plaintiff insisted all along that they would ship in accordance with the agreement, and that, if the sugar was not taken, it would be sold for the defendant's account. Thereafter the plaintiff shipped the balance of 1,800 bags of the quality and in the manner called for, and drew sight drafts for it on defendant. The sugar arrived at Des Moines on September 9th. The defendant refused to accept it or pay the drafts. The plaintiff then sold it for the account of defendant, and brought this action to recover the difference between the contract price of the 1,800 bags and the amount realized from the sale, plus freight, interest, and demurrage.

[1] The defense may be summarized as follows: That when the contract was entered into, and for several months prior thereto, the sugar market was "wild," due to a supposed shortage, and the price

rose steadily to unprecedented heights. That the defendant understood and believed the meaning and sense of the provision of the contract set out above was understood and intended by the plaintiff and the defendant that, should there be an abrupt and material rise in the price of sugar prior to the filling of the orders by plaintiff, whereby performance would cause plaintiff material loss, they would be excused, and for the same reason, if there should be an abrupt and material decline in the price of sugar, whereby the taking of said sugar would cause the defendant material loss, then, in that event, the defendant would be relieved from accepting or paying for the sugar. That on this understanding, and no other, the defendant signed the contract.

Other evidence was introduced from which it appears that the plaintiff had purchased from other parties on June 3d, a large quantity of sugar at 27 cents, in order to fulfill its contract with the defendant. That the defendant, between July 30th and October 15th, purchased 2,750 bags of cane sugar, most of it in September at a price less than that called for in its contract with Edgar, and handled a total of 6,733 bags during that period, and at all times continued to buy sugar and supply their usual trade, selling sugar in August, for instance, at $21 per hundred weight, about the time it wrote Edgar it would accept no more. Its sugar business during this time was 40 per cent. of normal. It is undisputed that the price of sugar began its advance in the fall of 1919 and went to 14 cents in January. In March or April it started up again and was quoted at 30 cents in June, 1920. Then followed a sudden break in the price, and a continual and material decline through the balance of the year, to 7 cents in January, 1921. The stipulation states that at the time the defendant refused to perform, the market price of the quality specified in the contract was $22.50 per 100 pounds.

At the conclusion of the case the defendant moved for a directed verdict on the grounds, among others, that:

"The record in this case affirmatively established as a matter of law that on August 5, 1920, that being the date when the defendant categorically refused to receive of plaintiff any further sugar, it had become commercially impracticable. That the defendant had further notified the plaintiff that it would not accept any further sugar, and hence, under the terms of the contract between the parties, the defendant under the terms of the contract was relieved from accepting any further sugar; it having given such notice prior to the consignment of the second shipment of sugar. It affirmatively appears as a matter of law that on the 1st day of August, 1920, the price of sugar, both at the point of delivery, which was New Orleans, and also in Iowa, was materially less than the contract price, and that the market steadily declined from day to day and from week to week throughout said month, and thereafter declined continually until the end of the year. That as a matter of law it thereby became and was commercially impracticable for the defendant to take said sugar, and it was hence relieved under the terms of the contract."

This motion was properly denied.

The plaintiff requested an instruction, among others, that the verdict should be for the plaintiff. It was refused, and proper exceptions taken. The trial court asked the jury to determine whether or not, on or about August 5, 1920, "business conditions and other extraneous causes" were such as to render the performance of the contract commercially impracticable, and directed that should they answer this

question in the affirmative; then to find for the defendant. The jury answered this special interrogatory, "Yes," and judgment was entered accordingly.

After reviewing this record, we think it fair to say that the only motive or excuse offered by the defendant for declining to accept the second consignment is that between the date of the contract and the performance the price broke sharply, and it became very evident that the defendant could not resell, except at a loss. The market in Iowa, where it did business, was overstocked, and the public and dealers were curtailing purchases, due, no doubt, to the extremely high price of the commodity, even after the first break in price. There is no allegation, however, that the performance would have crippled the defendant financially. It is admitted that it was able to perform its engagements and continued so to do.

It is material to note that, when this contract was entered into, both parties had knowledge that the price had soared to unheard-of figures —several times the price that obtained under normal conditions, which would be 7 to 8 cents. Therefore it may be said that they were engaged, not in dealing in a commodity, but in a highly speculative venture, and with their eyes open undertook a gamble, which necessarily could have no other result than a big profit to one and a corresponding loss to the other, depending on the way the market went. Both were experienced in this business, and must have known that, although the market might continue to soar, eventually the inexorable working of economic laws would cause a break as sharp and sensational as the rise had been. If this premise is true, neither party can be heard to complain that they did not anticipate what in fact happened, and which as a matter of law must have been in the contemplation of the parties on June 9th. The contract was less than 60 days old when defendant repudiated it. On July 30th the defendant made a request for cancellation that admittedly was not a rescission or exercise of any right under the contract. No change in conditions is shown from this date until the defendant formally breached the contract less than a week later.

It would seem that the defendant was logically forced to take the position it did, to wit, that, because sugar sold at $22.50 per 100 pounds at a time when its contract compelled it to pay $25.50, it was excused from performance. Is this a violent fluctuation, in view of the conditions that had existed in the sugar market, according to the defendant's answer, for nearly a year prior to the contract? Did any material factor enter into the sugar business that was not present, or could not have been reasonably anticipated, when the contract was signed? Millions of dollars worth of business is done and large profits and losses taken every day in reliance on agreements, written and oral, and for courts to allow the obligation of contract to be treated lightly, and disregarded every time either of the parties thereto find they have entered into a bad bargain, would result in chaos, and rightly bring the administration of justice into disrepute.

The defendant has not shown that this unusual term or expression "commercially impracticable" had some definite recognized meaning

in the trade within which it brought itself.  Further, it is undisputed that the defendant continued to supply its usual trade at current market prices, for which it obtained large quantities of sugar from sources other than the plaintiff at a slightly lower price.  The clause, therefore, cannot be defined as claimed by the defendant.  So there was no question for the jury, and plaintiff's request for an instructed verdict should have been granted.

[2] This conclusion necessitates the consideration of another question, to wit, the measure of damages.  As the jury found for the defendant, it might be said to be moot; but, as our decision on the first question requires that damages be assessed, a final settlement of this litigation will be expedited if we indicate our views on it.  The plaintiff's fourteenth requested instruction—which was properly refused— asked the court to charge that it was entitled to recover the difference between the contract price and the price actually realized, plus freight and storage charges, provided the jury found that in incurring and paying such charges it was acting with ordinary, reasonable care and diligence to protect the defendant against unnecessary loss.  The court charged as follows:

"So, if under all the circumstances you find that the plaintiffs when they got notice, absolute notice, of the refusal of the defendants to take the goods, could have saved part of the loss, though small, by selling at that time and place, or if they could have saved a part of the loss, though small by retaining it there instead of shipping it here in the face of directions by the defendant that it would not be taken, that amount which could have been saved by exercising such effort, even if it was nothing more than the freight, would have to be deducted from the damages they may recover."

By the great weight of authority the English doctrine of anticipatory breach has been adopted by American courts, but with some modifications.  The defendant's repudiation was absolute, so the plaintiff had the right, in the situation as it then existed, either to treat the notice as a breach and bring suit promptly, or await the time of performance and bring his action thereafter.  In either event he was excused from the necessity of performing or being ready to perform.  For an interesting discussion of this question, see Williston on Contracts, vol. 3, pp. 2345–2391; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; 13 Corpus Juris, 651 et seq.; United Press Ass'n v. Nat. Newspaper Ass'n. (8th C. C. A.) 237 Fed. 547, 150 C. C. A. 429.

The plaintiff here proceeded under the second alternative, and on the last of August delivered the sugar f. o. b. New Orleans, as per the contract.  On its arrival at Des Moines, defendant refused to take it, and plaintiff sold at the best price obtainable.  This was not justified in this case, because it is clear that the plaintiff thereby unnecessarily increased the damages, by making this shipment nearly a month after it had notice of the renunciation; sugar being a commodity which it could have as promptly disposed of at that time as later.  It was the duty of the plaintiff to take all steps that it reasonably could to mitigate the damages.  Mr. Williston says on this question, supra, at page 2347:

"There is a line of cases running back to 1845 which holds that, after an absolute repudiation or refusal to perform by one party to a contract, the other party cannot continue to perform and recover damages based on full per-

formance. This rule is only a particular application of the general rule of damages that a plaintiff cannot hold a defendant liable for damages which need not have been incurred, or, as is often stated, the plaintiff must, so far as he can without loss to himself, mitigate the damages caused by the defendant's wrongful act."

In 8 R. C. L. § 14, p. 442, it is said:

"It is a fundamental rule that one who is injured in his person or property by the wrongful or negligent acts of another, whether as the result of a tort or of a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize the resulting damage, and that to the extent that his damages are the result of his active and unreasonable enhancement thereof, or are due to his failure to exercise such care and diligence, he cannot recover."

This is the rule laid down in the cases supra, and 13 Corpus Juris, § 731, p. 655. Otherwise the injured party would have it in his power to inflict damages on a defendant without benefit to himself. The doctrine of anticipatory breach, according to Roehm v. Horst, supra, is based on Hochster v. Dè la Tour, 2 El. & Bl. 678, where Mr. Justice Crompton, after stating that the injured party could treat the contract as at an end, stated that the latter could say:

"But I will hold you liable for the damages I have sustained, and I will proceed to make that damage as little as possible."

Therefore Chief Justice Fuller, in Roehm v. Horst, supra, says in such case the plaintiff is entitled to compensation based on what he would have suffered by the continued breach of the other party, down to the time of complete performance. "Less any abatement by reason of circumstances of which he ought reasonably to have availed himself." This harmonizes with a case in this circuit, Kingman v. Western Mfg. Co., 92 Fed. 486, at page 490, 34 C. C. A. 489, 493, where it is held:

"1. The measure of damages for a breach of a contract to purchase personal property is the difference between the market value and the contract price of the property at the time of the breach, if the latter be greater than the former."

It would therefore seem that the plaintiff, although he had the right to make an election as to the date of delivery, could not increase the damages by incurring unnecessary expenses, such as freight and storage, and the court should have so charged.

The judgment of the lower court is reversed, and the case remanded.