## EWING v. VON NIEDA.*
### No. 10061.

Circuit Court of Appeals, Eighth Circuit.
March 18, 1935.

Thomas Gallagher, of Minneapolis, Minn. (Alfred W. Bowen, of Minneapolis, Minn., on the brief), for appellant.

Willis Doherty, of Minneapolis, Minn., for appellees.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

In September, 1930, appellee George Von Nieda was doing business in Minneapolis, Minn., as Von Drug Company, and was the owner and proprietor of a medicinal formula for medicines in tablet form under the name of Von's Stomach Treatment. In the development and expansion of his business Von Nieda established, by contract, distributors of his product in various parts of the United States, the business of each distributor being styled a "Von Company," preceded by the name of the city in which it was located. September 26, 1930, Von Nieda entered into a contract with appellant whereby appellant was established in business as a distributor in the city of Ligonier, Pa., under the name and style of Ligonier Von Company. By

*Rehearing denied May 23, 1935.

this contract Von Nieda, proprietor and manufacturer, agreed to furnish appellant with Von's Stomach Treatment Tablets, for the purpose of selling and distributing the same, in such quantities as should be ordered by appellant from time to time. The medicines so furnished were to be on consignment and were to remain the property of appellee until sold by appellant; the title then passing directly to the purchaser. Appellant had the right to advertise said medicines in newspapers, magazines, or periodicals wherever printed or published or in locations of appellant's own choice, subject only to censorship by appellee to protect against claims of misrepresentation and the like. Operating expenses were to be borne by appellant, who was to have the privilege of soliciting business through advertising, traveling representatives, or established agencies or dealers under him, at any place in the United States of America, Canada, or Mexico; such agencies and dealers to be supplied with medicine from appellant's distributing point at Ligonier, Pa. In the contract Von Nieda was designated as the party of the first part and appellant as party of the second part. The following paragraphs are especially pertinent to the questions presented:

"6. The party of the second part hereby agrees that he will make an accounting monthly to the party of the first part showing all sales made and the stock remaining on hand and that he will immediately thereafter remit to the party of the first part at the prices hereinafter agreed on or then in effect for the merchandise so sold by him.

"7. It is further agreed that the party of the second part will deposit with the party of the first part, upon the signing of this agreement, the sum of Two Hundred and Fifty Dollars ($250.00), receipt of which is hereby acknowledged by the party of the first part, which said sum party of the first part shall retain as a guaranty fund for the monthly payments to be made by the party of the second part for all sales of merchandise made during the previous month and if at any time the party of the second part fails to remit for the sales so made, the party of the first part may examine and inventory the stock remaining on hand in the hands of the party of the second part and reimburse himself out of the said guaranty fund for the merchandise sold or not accounted for by the party of the second part.

"8. It is further agreed that if at any time the said sum of Two Hundred Fifty Dollars ($250.00) shall not be sufficient to guarantee to the party of the first part the payment for merchandise on hand or on order by the party of the second part, the amount of the said guaranty fund shall be increased so that, however, it will not exceed in amount the value of the medicine on hand or on order and unaccounted for by the party of the second part."

"10. The party of the first part hereby agrees to bill the said medicines to the party of the second part and the party of the second part hereby agrees to pay the party of the first part for said medicines, when sold, upon the basis of the cost of manufacture to the first party as evidenced by the bill of the manufacturing laboratories, plus Fifty Cents (.50) per One Hundred tablets (100)."

The contract was to be for the term of five years, with option to appellant to renew same for a like term. Other provisions are not deemed essential for present consideration.

Appellant, alleging a breach of this contract by reason of appellees' alleged refusal to comply with its terms, brought suit against George Von Nieda and Sadie Von Nieda, his wife, as partners, for damages in the sum of $60,000. Upon trial the court directed a verdict in favor of appellees. From the resulting judgment this appeal is taken.

Following the execution of the contract appellant started business in Ligonier, Pa. He invested $1,500 at the outset, and, during the period between November, 1930, and July 6, 1931, expended nearly $6,000 in advertising. During the first two months he operated at a loss, but thereafter realized a profit which had become increasingly substantial in June and the first days of July of 1931. This was due in large measure to the advertising campaign conducted by appellant and the expansion of his business into wider territorial fields. His success and initiative received commendation from appellee. In a letter to appellant of November 11, 1930, Von Nieda said: "I have your letter of the 7th and was very much pleased indeed with the spirit toward the business evidenced in that letter. It is that sort of spirit that will make it a success for you. * * * You will find it very important that you should spend at least $250.00 advertising a month to get a real start."

And again, March 4, 1931, he told appellant's father "how well you are doing and how much I liked your spirit of enthusiasm in your work." By way of development and expansion appellant advertised widely in Ohio, from which state he says he was getting, in June, 1931, about 45 per cent. of his business. When this was first made known to Von Nieda, no objection was made by him. A distributor was located in Cleveland, and Von Nieda told appellant he would try to get the Cleveland man to move to Detroit. In this he was unsuccessful, as appears from his letter of May 8, 1931. In that letter he discloses that he had made an arrangement with this Cleveland distributor by which the latter was soon expected to control Ohio "as against any tablet competition." In conclusion, while he confesses he has no right to ask it, Von Nieda requests appellant to "stay out of Ohio." Appellant, in substance, declined to do so. At about this time, and largely for this reason, appellee's attitude toward appellant began to change, finally culminating in the events which form the basis of this litigation. This ultimate crucial situation is necessarily best disclosed by the correspondence.

In a letter of May 16, 1931, Von Nieda says he is awaiting an explanation of "what you intend doing relative to the advertising you have been running in Ohio." May 23, 1931, appellant replied as follows: "Regarding territory covered I'm sticking to the same territory that I was originally in as I showed you on the map while you were here and the increase of advertising in the last two months has meant that we are doubling up in these towns by increasing our insertions. Some towns we are in as much as four times a week."

Replying, May 27, 1931, Von Nieda says: "I also get an evasive reply as to my request that you stay out of Ohio with your advertising. Either evasive or defiant for you do say that you intend to stick by the territory you showed me when there and, as I remember it, that included all of Ohio."

And again, June 1, 1931: "One of the things I must have answered definitely is about your discontinuing all advertising in the State of Ohio."

June 5, 1931, appellant wrote as follows: "In reference to Ohio, if you will remember I showed you on the map that we covered the lower half of the state and was not advertising in Cleveland and Toledo and a number of other towns. Frankly we are getting about 45% of our business from the state of Ohio and at the present time the territory I have been covering is being combed by me and, therefore, I have no further room to expand."

Von Nieda in reply said: "I note what you say about Ohio and apparently there is no disposition on your part to accede to my request to withdraw from Ohio. It would seem to make no difference in your view point that the man in Ohio is confined to that one state for his business under his agreement with me and that he is now sticking closely to that agreement. I have another distributor in Indiana who has to confine their business to the one state of Indiana. A new arrangement is about to begin with the Omaha Distributor that will tie up the States of Missouri and Kansas as an exclusive proposition. Outside of these states of Ohio, Indiana, Missouri and Kansas, you are at present at liberty to advertise and draw business from any place in the country."

In conclusion on this point he says: "I must again insist, therefore, that you withdraw from Ohio entirely and keep out of Indiana, Missouri, and Kansas for the present."

Von Nieda's letter of June 12th contains the following important paragraphs:

"My contract with you gives me the right of censorship of your advertising. Therefore, before you run any advertising in July I must have a copy of all the ads you intend to run and the papers or periodicals, with their locations in which they are going to run. So you better get busy on your schedule and send it in, because it cannot be run until it has my approval.

"If you are going to require a larger number of tablets on hand than is covered by your present deposit with me of $250.-00 it will be necessary for you to put up more deposit at the rate of .788 per hundred for the full amount you have on hand at any one time."

Meantime appellant, by wire and letter, was urging the shipment of tablets to meet the increasing demands of the business. Next come the following letters from Von Nieda of date June 20, 1931:

"I guess there is just one way to find out whether you are going to be a worthy connection in the future or merely a Bolchevik and that is to have you answer definitely (Yes or No) the complete list of questions herewith enclosed.

"Therefore, please answer them, and sign, and return to me before the end of this month.

"The character of your answers, of course, will influence the length of your connection with this organization.

"Let me add that I have just completed a rather disagreeable contest about copyrighting ads with the Harvey-Massengale Advertising Agency at Atlanta but succeeded in persuading them that it just cannot be done with my product.

"Some of you do not seem to understand that complete cooperation is necessary to the success of this business for all of us and that competition among Distributors spells ruin for all. Most of them have now come to that realization and have assured me of their full agreement with that idea. You are the last to come into camp and my suggestion is that the sooner you come in, whole-heartedly, the better for you."

"Kindly answer the following questions, Yes or No: Will you immediately withdraw all advertising for the Ligonier Von Co. from the State of Ohio? —— Answer.

"Will you, hereafter, refrain from advertising for the Ligonier. Von Co., or its successor, in the States of Ohio, Indiana, Missouri and Kansas? —— Answer.

"Will you, hereafter, render to George Von Nieda, addressed to him at 1108 Nicollet Ave., Minneapolis, Minn. a true and complete report of all contemplated advertising, including the names and locations of the papers or periodicals to be used and their several locations, the amount of space, its cost, and a copy of the ads to be used, at least two weeks prior to publication? —— Answer.

"Will you refrain from copyrighting any ads or other material used in connection with the business of the Ligonier Von Co., or its successor? —— Answer.

"Will you, hereafter, operate the business of the Ligonier Von Co., or its successor, in a spirit of cooperation with George Von Nieda, and the other Distributors, giving them the benefit of any new ideas or materials that might prove of value? —— Answer."

June 24, 1931, appellant sent the following telegram: "Writing you reference to your letter of June twentieth My letter to you of same date states that we ran entirely out of tablets This is expensive for us Lets not have this happen again Our business is growing and we want your co-operation Have tablets been shipped Please wire immediately."

And the next day, June 25, 1931, wrote thus respecting the Ohio controversy: "I cannot see my way clear to withdraw advertisement for the Ligonier Von Company from the state of Ohio or other states. I have spent a large amount of time and money in developing certain towns in Ohio and a good share of my business is now coming from that territory. When you were here, I definitely showed you on the map, the territory I was covering and you knew at that time I was covering a good part of Ohio. In view of this fact you made no comments, as that was the time we could have discussed the matter and possibly could have understood each other on this point. It would be just as reasonable to ask the Ohio man to withdraw as it would be ask me to do so."

July 1, 1931, appellant sent this wire: "Supply practically exhausted Must have tablets Fill orders Wire immediately."

The next communication from Von Nieda was the following telegram dated July 6, 1931: "You must first cover future shipments tablets with full additional guarantee deposit before shipment can be made Stop No advertising can be run by you until full schedule and copy has my approval Stop See contract and my letter June twelfth Stop Leaving Friday for two months Western trip."

July 7, 1931, appellant by wire replied thus: "Present deposit sufficient to cover value of merchandise on hand or on order Unless I have wire reply immediately fifty thousand tablets have been shipped by express must consider contract broken by you Have stopped payment on June check until I receive tablets This will partially reimburse me for loss."

Von Nieda vouchsafed no response. Thereafter appellant disposed of the tablets remaining on hand and closed the business of the Ligonier Von Company. His suit was filed December 22, 1931. It was the opinion of the trial court that the contract empowered Von Nieda to demand a deposit sufficient to cover the amount of tablets on hand or on order by appellant at a value of 78.8 cents per hundred, composed of 28.8 cents, the cost to Von Nieda, plus a profit of 50 cents per hundred when sold. The court held that appellant breached the contract by refusing to com-

ply with Von Nieda's demand to this effect. That demand is contained in the foregoing telegram of July 6, 1931, which refers appellant to Von Nieda's letter of June 12, 1931.

It is unquestionably the duty of the court to construe all written instruments where the true meaning of the words, viewed in the light of ascertained surrounding circumstances, are made clear. Here the surrounding circumstances appear clearly from the record before us, and we are unable to agree with the learned trial judge in the construction he places upon the language of the contract. By paragraph 8 this deposit is made "a guaranty fund for the monthly payments to be made by the party of the second part for all sales of merchandise made during the previous month." Appellee might "reimburse himself out of the said guaranty fund for the merchandise sold or not accounted for." The medicines furnished were on consignment, and remained the property of Von Nieda until sold, and appellant was under no obligation to pay for them until sold. Prior to that time he would be compelled to reimburse Von Nieda for stock unaccounted for at the cost to the latter of 28.8 cents per hundred. There is no provision for the addition of 50 cents to cost of manufacture, except in case of sale. The language of the trial court, in its recital, when sustaining the motion for a directed verdict, leads to the same conclusion. He says: "Now, these tablets were shipped on consignment; in other words, the title did not pass to Ewing until he had made a sale of these tablets to a third party, and he was not responsible for the payment of any of these tablets until he had sold the tablets to a third party."

It is quite evident from the entire record that desire for an increased deposit was not the real basis of Von Nieda's demands. He had, without demur, during the course of their business relations, furnished appellant with tablets in an amount far in excess of the deposit of $250 if they were to be valued at the rate of 78.8 cents per hundred. This would, of course, not amount to a waiver of his right under the contract if occasion should warrant its exercise, but it bears upon the construction placed by the parties themselves upon the meaning of this contract provision. In his letter of March 4, 1931, Von Nieda calls appellant's attention to the fact that appellant has a stock of 50,350 tablets on hand, and

says: "I think you have enough for this month * * * but if you should begin to run short let me know and I will send you more any time." It was not until May that Von Nieda's friendly attitude toward appellant began to change. In his letter of May 8, 1931, he again calls attention to his arrangement with his Cleveland distributor, whereby he had practically guaranteed that this distributor should have no tablet competition in Ohio. This was, concededly, in direct conflict with the terms of appellant's contract which entitled appellant to solicit business, by advertisement or otherwise, at any place in the United States. June 8, 1931, Von Nieda announces that he is about to make a new arrangement with the Omaha distributor that "will tie up the states of Ohio, Indiana, Missouri, and Kansas." He graciously permits appellant to advertise and draw business from any place in the country except from these four states. Throughout the later correspondence Von Nieda's central idea was to compel appellant to retire from this territory in which he had expended considerable money in advertising, and had built up a substantial percentage of his business.

In his letter of June 12, 1931, referred to in his telegram of July 6, 1931, Von Nieda first mentions an increase of deposit. This is coupled with a demand for copies of advertising matter and for a definite statement that appellant would "keep out of Ohio, Indiana, Missouri and Kansas." In his letter of June 20, 1931, he warns appellant that the character of his answers to the list of questions therewith enclosed "will influence the length of your connection with this organization." He follows June 24, 1931, with this statement: "Until I get back the questions I recently sent you (contained in letter of June 20th) with your answers, I shall pay no attention to your letters or requests. That's final."

Those questions made no reference to the deposit, nor a demand for its increase. June 30, 1931, Von Nieda, "merely for the purpose of getting an expression of opinion," asks appellant how he would like "to move to Chicago under a new contract, with exclusive advertising privileges covering the States of Michigan and Illinois." Appellant replied that it would be impossible for him to move his headquarters from Ligonier because of his business interests and the extent of his investment in establishing his company there.

Then came Von Nieda's telegram of June 6, 1931, refusing further shipments of tablets until increase of deposit was made, this time joining a demand for submission of advertising schedules. He had already been advised that appellant was using, and intending to use, no advertising matter that had not already been approved. At no time did Von Nieda make suggestion or demand for increase of deposit except in connection with his insistence upon appellant's withdrawal from Ohio and other states, or upon inspection of advertising copy or both. Appellant was in no default with respect to the character of his advertising matter, and Von Nieda had no right under the contract to demand his withdrawal from the states named. Generally speaking, combining a lawful demand with one not required by contract renders the demand for performance insufficient. Von Nieda had made two contracts and contemplated others which materially restricted the territorial rights enjoyed by appellant under his contract. He seems to have been determined to compel appellant to accept these limitations. Failing to get appellant's "co-operation," he resorted to shutting off the lifeblood of the business by refusing to ship supplies. We find it impossible to escape the conclusion that the joinder of the other demands made, either unwarranted or unlawful under the terms of the contract, was merely for the purpose of cloaking the real object of compelling appellant to withdraw from the states already allotted, or to be allotted exclusively to others.

■ The final position taken by Von Nieda in refusing to ship tablets, unless appellant complied with unwarranted demands, constituted a breach sufficient to support an action for damages. The following language from Black on Rescission and Cancellation, § 204, is apposite:

"Hence a declared intention to repudiate a contract, or to refuse to perform it, excuses the other party from the necessity of tendering performance, though this is not technically a rescission nor the acceptance of a rescission, since it leaves the contract in existence so far as to sustain an action for damages for its breach. 'Where one party to a contract renounces it and refuses to perform, the other party may treat the contract as broken and abandon it without demand or tender of performance, and recover as damages the profits he would have received through full performance. Such an abandonment is not a rescission

of the contract, but a mere acceptance of the situation which the wrong doing of the other party has brought about.' According to a slightly different view, the party who declares his intention not to perform may be considered as having rescinded the contract, but it is a wrongful rescission, for which an action will lie. The other party may 'agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission.' He 'may adopt such renunciation of the contract by so acting upon it as in effect to declare that he, too, treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation.'

"An intention to refuse performance of a contract may be manifested by an explicit declaration to that effect, as where a buyer of personal property refuses for two years to pay a deferred installment of the price, and, in his pleading in an action by the seller to recover possession, repudiates any further obligation. But a refusal in so many words is not necessary. For if the party, while the contract remains executory, does an act, or pursues a course of conduct, which shows indubitably that he does not intend to perform his part of the contract, this justifies the other party in treating it as ended. And where one party to a contract violates some of its substantial provisions, so as to deprive the other party of the benefits of the contract, and manifests an intention to continue such breaches, the other party may abandon further performance of the contract and sue for future profits, although such breaches do not amount to a physical obstruction or prevention of performance by such other party."

■ By continuing only long enough to dispose of the few tablets then on hand, appellant did not waive Von Nieda's repudiation.

"When one party to a contract gives notice to the other party, before the latter is in default, that he will not perform such contract on his part and does not retract such notice before performance on his part is due, such other party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract upon his part in favor of the former party. Edgar & Son v. Grocers' Wholesale Co. (C. C. A. 8) 298 F. 878, 882." Bu-Vi-Bar Petroleum

Corp. v. Krow et al. (C. C. A. 10) 40 F.(2d) 488, 491, 69 A. L. R. 1295.

The question of partnership does not appear to have been seriously presented nor considered. The contract contained provisions that appellant might cancel it at any time upon giving a prescribed notice, and that, in event of cancellation in accordance with those provisions, appellant should refrain for a period of five years from that date from engaging in direct competition with Von Nieda's business. Appellant subsequently organized a similar business under the style and name of "Toma Incorporated," and Von Nieda by cross-bill claimed damages for breach of contract on this ground. Of course this provision of the contract would apply only in case of cancellation under the terms prescribed. However, this phase of the litigation does not appear to have received consideration in the disposition of the case. This and other questions under the issues framed may and will arise upon a complete retrial of the case. We anticipate no probable error in their solution by the trial court and confine ourselves to a disposition of this appeal upon the error assigned to the action of that court in directing a verdict in favor of appellees. Accordingly, we hold that the judgment below must be reversed and the case remanded for further proceedings not inconsistent with this opinion. It is so ordered.