# CHARLESTON.

Ashland Coal & Coke Co. *v.* Hull Coal & Coke Corporation.

Decided May 10, 1910.

1. Contracts—*Waiver of Breach—Acceptance of Part Performance.*
    Although a condition precedent in a contract must be fully performed, in order to bind the opposite party to performance of his reciprocal obligation, acceptance of performance of only a substantial part thereof precludes reliance upon the breach as matter justifying renunciation or discharge of the contract.

2. Same.
    Partial interruption, for a time, of a continuous duty, imposed by a contract, amounting to a breach of a condition precedent, is unavailing as ground of repudiation, if such partial performance has been accepted until the period of interruption has ceased.

3. Same.
    Under such circumstances, waiver of the breach to the extent aforesaid, follows as a matter of law, and is not a mere question of intent for jury determination.

4. Same—*Suspension of Performance—Election Between Cancellation and Acceptance.*
    A clause in a contract between a coke producing company and its sales agent, providing that, for certain specified causes, deliveries thereunder may be suspended or partially suspended, or, at the option of the party not in default, may be immediately canceled, during the period of such interruption, by immediate notice to that effect, contemplates partial performance, under such circumstances, in the absence of cancellation, and imposes upon the party not in default the duty of election between cancellation and acceptance of partial performance, on the happening of the contingency or as soon thereafter as may be practicable.

5. Same.
    Such clause does not authorize cancellation for all time, but only during the period of interruption.

6. Same—*Breach—Rights of Other Parties.*
    Failure of full performance, due to causes other than those specified in such clause, amounts to a breach, but, if the opposite party induced or caused such breach by its own default, it can take no advantage of it.

67 W. Va.

7. **SET-OFF AND COUNTER CLAIM—*Claim for Unliquidated Damages.***
   A claim for unliquidated damages is not available as a set-off.

8. **SAME.**
   Such a claim may be proved in reduction or bar of the plaintiff's demand, if it grows out of the contract on which the plaintiff sues, but no recovery over in favor of the defendant can be had thereon.

Error to Circuit Court, McDowell County.

Action by the Ashland Coal & Coke Company against the Hull Coal & Coke Corporation. Judgment for plaintiff and defendant brings error.

*Reversed and Remanded.*

*A. W. Reynolds* and *Lucien H. Cocke,* for plaintiff in error.

*Anderson, Strother & Hughes,* for defendant in error.

POFFENBARGER, JUDGE:

The refusal of certain instructions, asked for by the defendant, and the giving of an instruction, prepared and given by the court in lieu of those requested, constitute the grounds of complaint on this writ of error.

The Ashland Coal & Coke Company sued The Hull Coal & Coke Corporation, in *assumpsit,* for about $2,800.00, the price of coke sold to the latter in the months of June and July, 1906. The defendant claimed by way of set-off, $4,362.34, as commission on certain other coal, and, by way of recoupment, $2,575.37, both of which cross-claims grew out of an alleged breach of contract on the part of the plaintiff. The jury disallowed both and rendered a verdict for the full amount of the claim of the plaintiff.

The contract involved was made about the first of February, 1906, and is evidenced by two letters, one written by Frank A. Hill, President of The Hull Coal & Coke Corporation, dated February 3, 1906, proposing, on behalf of said corporation, to act as sales agent for the coke manufactured by the Ashland Coal & Coke Company from February 1, 1906, until October 1, 1906, and to take and dispose of the entire output of said company's plant, on a commission of eight per cent. on the selling price of the coke on board the cars at the ovens guaranteed to be not less

than·$1.85 per ton of two thousand pounds, and to guarantee all accounts and remit in cash on the 25th of each month for all coke passing over the scales during the previous month; and the other, dated March 5, 1906, accepting said proposal. Said first letter contained the following additional provision: "Our usual strike, accident and transportation clause which reads as follows to mutually govern:— 'In case of strike, accident, deficient transportation or other cause, unavoidably causing stoppage or partial stoppage of the work of the manufacturer of this coke, or of its shipment, or in case of accidents unavoidably causing stoppage or partial stoppage of the works of the buyer, deliveries herein contracted for may be suspended or partially suspended, as the case may be, or, at the option of the party not in default, may be immediately canceled during the continuance of such interruption by immediate notice to that effect given to the other party.' "

Whether technically the defendant was a sales agent or a purchaser of the coke is an immaterial question, since it does not deny its liability for the price of the coke sued for. Its answer to the demand of the plaintiff is a claim of recoupment, founded upon the alleged breach of the contract.

In the months of February, March and April, 1906, the contract was observed and complied with by both parties; but, in May of that year, the defendant was unable to handle the entire output of the plaintiff's plant. This disability continued through the month of June. As to whether it was able to take all the coke contracted for in July, is a controverted matter and constitutes the crucial question in the case. About May 1st, the defendant lost a large contract with the Algoma Steel Company at Sault Ste Marie. Sometime after that, an accident happened to the plant of another customer at Roanoke, Virginia. These adversities seem not to have been reported to the plaintiff at once, but the requisitions for coke from its plant fell off greatly, with the result that many of its ovens had to be put out and its force of laborers greatly reduced. However, it continued to deliver such quantities of coke as the defendant called for and never ceased to do so until about July 24th. In February, the defendant took 190 cars, in March 261, in April 218, in May 60, and in June 104. The plaintiff had, at its two plants, Ashland and Monitor, 410 ovens, of which the largest number

in operation at any time was 260. These were reduced from time to time until the number in blast fell to 64. This is said to have been attended by a loss of from five to ten thousand dollars a month. No notice of any intention to cancel or repudiate the contract was given, however, and the plaintiff continued to take the benefit of it, as has been stated. It was advised of the embarrassment under which the agent company was laboring. On May 7th, it addressed an inquiry to the agent company as to why it was not receiving orders for its output of coke, saying "we are burning only 175 ovens at present, but you are furnishing us with orders for only 50." This letter was replied to on May 10th, and the loss of the Algoma contract reported, with the additional information that another company had defeated the Hull Corporation by cutting the price ten to fifteen cents and representing superiority of their coke. The following further statement in this connection was made: "It is not hard for them to convince the Soo people of this fact as when we made claim for our coke being of as high quality as the other people they showed us continuous analyses of coke from two of our plants which we had been shipping them there, the ash for days ran as high as fifteen per cent. This has temporarily reduced our coke shipment. We, however, expect to close a business tomorrow of equal volume to that which we have lost, and should we be successful in this, we will at once advise you, and it will not be necessary to put out any more ovens; in fact it would almost be necessary to put in some additional ovens to obtain the output." On June 13th, 1906, the Hull Corporation reported the accident to the Roanoke furnace and then said: "Our sales for shipment after July 1st, as of today, would indicate an output from your oven of five to seven cars daily unless we should be able to increase our sales between now and July 1st. This, of course we expect to do. Until July 1st, the indications are that we will have to live from hand to mouth and the tonnage we can take from will be very uncertain." They also sent the result of an analysis of coke shipped in April, made by the Algoma Steel Company people, showing 17.17% ash, an amount considerably in excess of that allowed in Standard Pocahontas coke which the plaintiff had agreed to furnish. The record discloses no intimation of intention on the part of the

plaintiff to cancel or repudiate the contract on account of the breach thereof by the defendant, after the receipt of this information, until July 25th. As we have stated, it furnished 104 cars in June and from July 1st until July 24th, when it ceased to make deliveries, it furnished 61 cars, but there is evidence tending to show more were demanded of it in July.

In the meantime, without the knowledge of the Hull Corporation, the plaintiff entered into negotiations with the Norton Iron Works, of Ashland, Ky., through an agent, for the sale of its coke to that company, which culminated in a contract for the entire out-put of the plant, bearing date June 20, 1906, but it is admitted that it was not actually signed until Aug. 1, 1906. W. A. Phillips, President of The Ashland Coal & Coke Company, said in his testimony: "I think the contract had been entered into on July 20th, but had not been signed until Aug. 1st. The mistake was made in placing June instead of July, the earlier date." Said company, on July 25, 1906, formally notified the defendant that it had sold the product of its ovens to the Norton Iron Works and could not ship any more to the Hull Corporation. Thereafter it ceased to do so and sold all of its coke to the Norton Iron Works. It is on the coke so sold that the defendant claims a commission of eight per cent.

As to the situation of the defendant and its relation to the plaintiff from July 1st until July 25th, there is conflict in the testimony. The former claims that, relying upon the silence and acquiescence of the latter, with full notice to the plaintiff of the circumstances, causing embarrassment, and its intention to relieve the situation by securing new contracts, it did secure them and was in a condition on or before July 25th to take the entire out-put of the plaintiff's ovens, and, from July 1st until July 25th, made requisition upon it covering the entire out-put of the plant, and gave shipping directions for all of the cars, the latter reported as having been received and loaded. It continued, through the months of July, August and September, to send in its written requisitions, which were ignored. The plaintiff says these requisitions were not made in good faith, but simply to bolster up a claim. It denies that the defendant had any customers for the coke and says these requisitions named nobody as consignees, wherefore no shipments could be made under them. Some of its agents say in their

testimony they repeatedly called up Mr. French, the agent of
the defendant, and asked him for shipping directions which he was
unable to give. On the other hand, Mr. French testifies to the
number of cars for which he gave consignments from June 22nd
to June 30th, and closes by saying: "On June 30th we con-
signed three cars that were loaded by The Ashland Coal & Coke
Company on the 27th of June, which, according to the records
furnished us by The Ashland Coal & Coke Company were the
last unconsigned cars on their yards." He then stated facts
tending to show, and claimed, that all the coke loaded in June
had been removed on July 2nd except seven cars and said they
were consigned. He then stated what occurred in July and
said the Ashland Company reported 19 loaded cars on their
tracks on July 10th, but they had been tagged for shipment
and were allowed to stand there by the railroad people, and that
on July 12th they reported the receipt of ten empties and the
loading of four, leaving on hand six empties and nine loaded
cars. He then said: "After that date they were evidently
shipping to other parties and did not give us this information,
though we were demanding that our orders be filled." In his
testimony in chief, he said that, on discovering that his orders
were not being filled, he went to the office of the Ashland Com-
pany and demanded of Mr. Phillips, their manager; Mr. O'Neal,
their superintendent, and Mr. Babb, their bookkeeper, the filling
of his orders. He further says he gave them information that
his company needed coke and asked them to increase their ship-
ments and says he urged them to prepare to increase their
out-put. He says that, in the effort to obtain coke from them,
he visited their plant on July 7th, 11th and 18th, and made a
vigorous protest against their shipping to other parties, adding
"I found out they had quite a number of cars billed to other
parties than ourselves and I demanded that they destroy the
tags on the cars consigned to other parties than ourselves and
to tag the cars in conformity with our requisitions."

After the introduction of all the evidence, the defendant
asked the court to instruct the jury, (1) that the letter of
July 25th, 1906, was an effort to cancel the contract, and that,
in so doing, the plaintiff broke its contract, if the jury should
believe that, on that date and prior thereto, the parties had
been executing the contract, and at that time the defendant was

tendering and ready and willing and able to tender orders for coke sufficient to cover the out-put of the ovens; (2) that, if the jury should find for the defendant, they could assess in its favor such damages as would compensate it for losses resulting from the breach of the contract by the plaintiffs, whether such losses consisted of advanced prices, paid for coke by the defendant, to fill its contracts, made on account of coke the plaintiff was to furnish, or loss of commission on coke sold by the plaintiff to other parties than the defendant; (3) that, if the jury believed the defendant had failed to comply with its contract prior to June 13, 1906, and that the plaintiff was informed of this fact on or about that date, and that said failure would continue until July 1st, and, after that date, the defendant would be able to take from five to seven cars per day, and the plaintiff accepted such information and continued thereafter to take the benefit of the contract and led the defendant to believe the promise of its letter was satisfactory, such acts constituted a waiver on the part of the plaintiff, and that if they believed the defendant was ready, willing and able to furnish orders during the month of July and thereafter for five to seven cars per day, and the plaintiff was informed of that fact, the action of the plaintiff on July 25th constituted a breach of the contract; (4) that the defendant was entitled to a commission of eight per cent. on the coke sold to the Norton Iron Works and persons other than the defendant or its consignees, during the time covered by the contract, February 1, 1906, to October 1, 1906, if the jury believed such sales had been made by the plaintiff, and the defendant had made contracts for the sale of said coke and was demanding delivery thereof by the plaintiff on its orders and consignments; (5) that, if the jury believed the defendant, before notice from the plaintiff of its intention to cease to make deliveries of coke under the contract, the defendant was demanding delivery thereof, and, under the belief that the plaintiff would continue to observe its contract, had made contracts for the sale of the coke to be delivered to it by the plaintiff, and, by reason of the breach of the contract on the part of the plaintiff, the defendant had been compelled to buy coke from other parties to enable it to comply with its own contracts, made as aforesaid, at a price greater than it received for the same, the plaintiff was liable

to the defendant for the difference between the prices it paid and the prices received for such coke and the defendant entitled to off-set such damages against the account sued on; (6) and "that if they believe from the evidence in this case that the defendant did not furnish to the plaintiff sufficient orders to cover all the coke manufactured by it or which it was able and desired to manufacture during the months of May, June and the early part of July, 1906, and further believe from the evidence that on the 25th day of July, when the plaintiff informed the defendant of its intention to cease delivery of the coke under the contract sued on in this case, the defendant had secured contracts for and was demanding the delivery of all the coke that the plaintiff was then making and was able and desired to make between that date and the first day of October, 1906, then the failure of the defendant during the months of May, June and the early part of July, 1906, to furnish sufficient orders to the plaintiff for its coke as aforesaid, did not give the plaintiff the right to cancel and refuse to comply with the said contract on and after the 25th day of July, 1906."

The court refused all of these instructions and gave one, prepared by itself, embodying in a general way, practically all that is included in those rejected, and covering nearly two pages of the printed record. It is not separated into paragraphs nor even sentences and is very much involved. We will not undertake to analyze it fully. It suffices to point out one fatal defect in it, and to show which of the instructions, requested by the defendant, should have been given.

In lieu of the defendant's 6th instruction, above quoted, the court inserted this in its instruction: "And that such breach was not waived by the plaintiff." The difference between the two instructions on the subject of waiver is manifest. The one requested by the defendant sets forth hypothetically the facts and tells the jury that, if they find they are established, the plaintiff has waived the breach, committed by the defendant, and cannot rely upon it as matter of defense to the claim of recoupment. Sometimes a waiver is a mere matter of intention, a fact to be ascertained by the jury; but it is not always so. It is often a mixed question of law and fact and, when it is, the court, if asked to do so, should submit only the questions of fact to the jury, and declare the law thereon itself. The in-

struction on this question, prepared by the court, submits to the jury both the law and the facts. The one asked for by the defendant would have submitted the questions of fact only, and it should have been given, if it embodies in the hypothetical statement all of the elements necessary to constitute a waiver. Reading it in the light of the evidence, we think it does. That the plaintiff continued to take the benefit of the contract, as far as the defendant was able to perform it, through the months of May and June and up into the month of July, is an uncontroverted fact. In its bill of particulars and the testimony of its witnesses, the plaintiff claims from the defendant the purchase money of coal delivered as late as July 23rd and possibly July 24th. This instruction does not affirmatively and positively state this salient and vital fact in the case, but it is therein embraced by implication in two places. It says this: "And further believe from the evidence that on the 25th day of July, when the plaintiff informed the defendant of its intention to cease deliveries of coke," which carries the necessary implication that deliveries had continued up until that time. The like implication is found in this clause: "Then the failure of the defendant during the months of May, June and the early part of July, 1906, to furnish sufficient orders to the plaintiff for its coke as aforesaid." The assumption of an admitted fact in an instruction is always permissible. Indeed, it would be wrong to submit it to the jury as a matter in controversy. Blashf. on Instruc. section 36, citing numerous decisions. If it could be said this material fact has been omitted from the instruction, no possible injury or prejudice could flow from the omission, so far as we are able to see. Both parties say it is true. The plaintiff's claim is founded upon it as true and the defendant admits it. Can it be supposed, for an instant, that the jury could overlook it or that it could escape their attention? However this may be, it has not been omitted. Though informal and only impliedly expressed, it is included in the instruction as a *concessum.*

If the plaintiff had desired to do so, no doubt it could have suspended the contract on the failure of the defendant, for the reasons disclosed by it, to take the product of the plant. The contract contemplated it, by giving, to the party not in default, the alternative right of cancellation, during the continuance

of an interruption, by immediate notice to that effect, but that would have been mere suspension, during the period of the interruption, founded upon a cause, specified in the contract. This clause, therefore, cannot be construed as precluding right of repudiation for a breach of the contract, a failure to take the product of the plant, not justified by such cause. But as the instructions we are now considering assume or concede, for their purpose, the non-existence of such cause, this phase of the case turns on the ability of the defendant to take the out-put of the plant, when the plaintiff gave notice of renuncia-. tion or repudiation. Hence the construction of the strike clause will be deferred for the present. It seems clear that the plaintiff, after having taken the benefit of the contract to the extent of the ability of the defendant to perform it, with full knowledge of the non-performance and the conditions relied upon by way of excuse therefor, could not, after the breach on the part of the defendant had ceased to exist, repudiate or cancel the contract on the ground of such past breach. Full performance by the defendant, or partial performance, justified by the cause specified, may have been originally a condition precedent, or the fulfillment of a dependent or concurrent promise or undertaking, but, if that be true, failure on the part of the plaintiff to avail itself of the breach or non-performance thereof reduced it to a mere warranty and rendered it no longer available as justification for non-performance of the reciprocal obligation. "A condition precedent may change its character in the course of performance of the contract; and a breach that would effect a discharge, if treated as such at once by the promisee, ceases to be such, if he goes on with the contract and takes a benefit under it. Accordingly, if, after breach of a condition precedent, the promisee continues to accept performance, the condition loses its effect as such, and becames a warranty in the sense that it can be used only as a means of recovering damages." Hammond on Contracts, p. 923; Clarke on Con., p. 466; Page on Con., sections 194-1505; 9 Cy. 646; 7 A. & E. Enc. Law 152. This principle is well stated in *Wiley* v. *Athol,* 150 Mass. 426, in the following terms: "But although conditions precedent must be performed, and a partial performance is not sufficient, yet when a contract has been performed in a substantial part, and the other party has voluntarily accepted and

received the benefit of the part performance, knowing that the contract was not being fully performed, the latter may thereby be precluded from relying upon the performance of the residue as a condition precedent to his liability to pay for what he has received, and may be compelled to rely upon his claim for damages in respect of the defective performance." To the same effect see *Lyon* v. *Bertram*, 20 How. 140; *Witers* v. *Green*, 9 How. 213; *Thornton* v. *Wynn*, 12 Wheat. 183; *Perley* v. *Balch*, 23 Pick. 283; *Burnett* v. *Stanton*, 2 Ala. 183; *Kase* v. *John*, 10 Watts. 107; *Kenworthy* v. *Stevens*, 132 Mass. 123. The principle was applied under conditions similar to those presented here in *Mill Dam Foundry* v. *Hovey*, 21 Pick. 417, in which it is said and held: "That although an interruption of the mill power might be construed to be the breach of a condition precedent, which would authorize the defendant to break off from the performance of his contract, yet if he continued in the performance until the power was re-established, this would amount to a waiver, and he would no longer be excused from further performance; although if he had suffered loss by the delay in furnishing the power, he would have a remedy by an action for damages."

Under this principle, waiver follows as matter of law, if the facts conditionally assumed in the instruction are true Hence, the refusal of said instruction and failure to give a proper one on the subject matter thereof constitute error to the prejudice of the defendant, for which the judgment will have to be reversed and a new trial allowed.

The same principle sustains defendant's instructions Nos. 1 and 5. All the others were properly refused. Nos. 2 and 4 are bad, for lack of a limitation on the amount of the damages claimed by way of recoupment. Neither of these claims is a set-off. A set-off is a debt due the defendant from the plaintiff. *Case Mfg. Co.* v. *Sweeney*, 47 W. Va. 638; *Clark's Cove Guano Co.* v. *Appling*, 33 W. Va. 470; *Harrison* v. *Workman*, 8 Leigh 296; *Robertson* v. *Hogshead*, 3 Leigh 667; *Christian* v. *Miller*, 3 Leigh 78. Unliquidated damages cannot be the subject of a setoff. The loss of commission by reason of plaintiff's alleged breach of the contract is a claim of that kind. The commissions were not earned. The defendant did not sell the plaintiff's coke to the Norton Iron Works, on account

of which the commissions are claimed. Therefore, the claim is for unliquidated damages, arising out of an alleged wrongful prevention of gain or profit the defendant would have earned, if it had been permitted to make the sales. Such damages, like those embodied in the other claim, constitute mere matter of defense, going to reduce or bar recovery, but affording no basis for a verdict or judgment over in favor of the defendant. *Gas Co.* v. *Healy,* 33 W. Va. 102, 106; *Baltimore &c. Co.* v. *Bitner,* 15 W. Va. 455, 464; *Baltimore &c. Co.* v. *Jameson,* 13 W. Va. 833, 838.

Instruction No. 3 embodies defendant's interpretation of the suspension or strike clause and claims the benefit thereof under a state of facts hypothetically submitted to the jury. For the purpose of testing the correctness of this instruction and settling the principles of the case for the new trial, it becomes necessary to construe this clause. We think it gives right to the party not in default, in the case of an accident of any of the kinds therein mentioned, not to cancel the contract wholly and for all time, but only during the period of the interruption. This accords with the letter of the clause. It says immediate notice of cancellation shall be given, if such party desires to cancel. This negatives the right to cancel by notice at any time such party may see fit to do so, within the period of interruption. The desire to cancel must be communicated immediately on the happening of the interruption or as soon as may be practicable thereafter. The party having such right must elect at the beginning of the period whether he will cancel or take partial performance. Then the clause says the contract may be canceled during the period of interruption, which excludes the idea of a cancellation for all time. Partial performance, however, is not optional with either party. It is justified only by the causes specified. Partial performance not justified in that way is a breach of the contract. When there is justifiable partial performance, it does not alter the contract nor confer any right of alteration. All of this is within the contract. It is provided for by it. Just what considerations induced the insertion of this provision in the contract, we do not know, but it is easy to perceive some upon which it may have been founded. Partial performance on the part of one company might, under certain circumstances, become very

embarrassing to the other. The producing company might find the closing of its plant decidedly more economical than partial operation during the period of interruption; or it might have an opportunity to dispose of its entire product to some person other than the agent, during such period, but no chance to dispose of a portion of it while bound to deliver the other part to the agent. Similar considerations might make this right of suspension highly valuable to the agent company. Every word, phrase and clause in a contract must have some force and effect, and there is a presumption that the parties inserted them for reasons sufficient and satisfactory to themselves, whether the court is able to see them or not.

Instruction No. 3 adopts the erroneous view that the letter of June 13, 1906, indicating probability of capacity to take no more than five to seven cars per day, after July 1st, and failure of the plaintiff to reply thereto or indicate, in any way, its dissatisfaction with the prospect, amounted to a modification of the contract and relieved the defendant of its obligation to take more than that quantity of coke after July 1st. When that letter was written, the defendant was operating under the suspension clause, without any notice of a desire on the part of the plaintiff to suspend the contract during the period of interruption. It was bound to exert itself to overcome the difficulties, causing the interruption and put itself in a situation, as soon as possible, to take the entire out-put of the plaintiff's plant. Its partial performance was justified only during the period of its inability to render full performance, and if it was able to take all the coke that the plaintiff could produce after the first of July, or, by the exercise of reasonable diligence, could have been able to do so, but was not, it was bound to take it in the one instance, and its refusal to take it, in the other, amounted to a breach of the contract. Therefore, we think this instruction was properly refused.

In conformity with our interpretation of this clause, we are of the opinion that the loss of the Algoma Steel Company contract was not one of the causes of interruption specified as justifying partial performance, if such loss resulted from underbidding by a competing company, and failure on the part of the defendant to take all of the plaintiff's coke, due to such loss, constituted a breach of the contract, justifying renuncia-

tion thereof by the plaintiff. But, if the loss of that contract was due to bad quality of coke, produced by the plaintiff, it would be estopped to set up the loss of that contract as justification for repudiation. A party to a contract is not discharged by a breach, occasioned by its own failure of duty. Again, if failure resulted from loss of said contract by under-bidding only, the plaintiff waived the breach by continuing to take the benefit of the contract after notice, provided the defendant was ready to take the entire out-put of the plant, when the plaintiff attempted to renounce the contract. On the other hand, we think the accident to the Roanoke Furnace Company, causing partial failure of performance on the part of the defendant, was one of the causes specified in the contract. That clause says "accidents unavoidably causing stoppage or partial stoppage of the works of the buyer" may suspend or partially suspend deliveries, in the absence of notice to completely suspend during the period of interruption, given by the party not in default. The Hull Coal & Coke Corporation was not the buyer within the meaning of the contract. It was designated therein as agent to sell the coke to other persons and guarantee and collect from them the purchase money. Plainly, its customers were the persons referred to as buyers.

Our conclusion is that the court erred in refusing defendant's instructions Nos. 1, 5 and 6 and in giving its own charge to the jury, from which it follows that the judgment must be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and Remanded.*