## BU–VI–BAR PETROLEUM CORPORATION v. KROW et al.

### No. 176.

Circuit Court of Appeals, Tenth Circuit.

April 4, 1930.

Edward P. Marshall, of Tulsa, Okl. (Charles O'Connor and J. J. D. Cobb, both of Tulsa, Okl., on the brief), for appellant.

John H. Cantrell, of Tulsa, Okl. (A. J. Biddison, Harry Campbell, and Valjean Biddison, all of Tulsa, Okl., on the brief), for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

A. D. Krow, S. S. Mohrman and Wade Z. Paxton brought this action against the Bu-Vi-Bar Petroleum Corporation to recover damages for the breach of a contract to drill an oil and gas well. The parties entered into an oral contract by which the defendant agreed to drill an oil and gas well to the Wilcox sand, on the SW¼, Sec. 15, Township 23, Range 5. This well was to be commenced within fifteen days after the completion of a well which the defendant was then drilling, known as the Redd well, and which was, in fact, completed March 20, 1927. The plaintiffs were to assign to the defendant, within ten days from August 2, 1926, good and sufficient oil and gas leases covering the NE¼, S½NW¼ and the N½SW¼, Sec. 15, Township 23, Range 5. The plaintiffs also were to deliver to the defendant "dry hole" contribution agreements from the Pure Oil Company for $3,000, from the Magnolia Petroleum Company for $2,500 and from Thomas B. Slick for $500. Thereafter, and on August 2, 1926, the defendant, through J. Garfield Buell, as its president, addressed a letter to the plaintiffs in which it set forth substantially the terms of the oral contract, excepting such letter omitted to state the depth to which the well was to be drilled. The plaintiffs endorsed the word "accepted" on the letter and signed their names thereto.

At the time the contract was entered into, Mohrman and Paxton held a lease from Glover covering the S½NW¼, Sec. 15, and had contracted for two leases, one from Mary E. Paxton, covering the NE¼, Sec. 15, and one from Melinda C. McFadden, covering the SW¼, Sec. 15. The Paxton and McFadden leases had been delivered in escrow to the Bank of Commerce, of Ralston, Oklahoma. The escrow agreements provided that the leases should be delivered to the lessees upon commencement of an oil and gas well in the SW¼, Sec. 15, and that the lessees should commence such well on or before August 20, 1926.

At the time of the making of the oral contract, plaintiffs advised the defendant that the McFadden and Paxton leases were in escrow and could not be delivered until the oil well had been spudded in on Sec. 15. On August 12, Krow, in compliance with a request of the defendant, took the Paxton and McFadden leases to the office of the defendant, where the latter examined the leases, made photostatic copies thereof and then returned the originals to Krow. At the same time, assignments of these leases were delivered to and accepted by the defendant, with full knowledge of the escrow agreements. An assignment of the Glover lease was delivered to the defendant on August 28, 1926. This assignment was retained by the defendant until March 23, 1927, when the defendant mailed it to Mohrman.

Shortly after the contract was entered into, a "dry hole" contribution agreement for $500 was secured from Slick and delivered to the defendant. The Pure Oil Company advised plaintiffs that if Buell would communicate with such company it would agree to a contribution of $3,000. Defendant was advised of such fact by plaintiffs. After the contract was made, the defendant and the plaintiffs agreed that, should the Magnolia Petroleum Company be unwilling to make a "dry hole" contribution, plaintiffs should make such contribution.

The plaintiffs testified that they were at all times, after August 2, 1926, able, ready and willing to provide "dry hole" contributions to the extent of $6,000 and that the defendant never made a request for such "dry hole" contributions.

By a sufficient writing and for a consideration of $175 paid by the plaintiffs, the time to commence the well under the Paxton escrow was extended to May 1, 1927. On August 7, 1926, by a sufficient writing, the time to commence the well under the McFadden escrow was extended to November 1, 1926. On October 30, 1926, by a sufficient writing, McFadden further agreed to extend the time to commence the well, in consideration of the payment of $25.00 per month, payable in advance, until the well should be commenced. This agreement provided that it should "expire February 1st, 1927." Plaintiffs paid and McFadden accepted payments of $25.00 per month for each month to and including March, 1927. By accepting the payment for March, McFadden impliedly extended the time for drilling the well to and including April 1, 1927.

In August, 1926, Buell told Paxton and Mohrman to secure extensions so as to keep the leases alive. In October, 1926, Buell told Mohrman to have Krow construct a pond to provide water for drilling the well and to send the bill to the defendant. In November, Buell inquired of plaintiffs whether they knew of any one who could drill the well. Plaintiffs suggested one Donahue. Buell requested Krow to have Donahue get in touch with Buell. Thereafter, Buell had negotiations with Donahue for the drilling of this well to the Wilcox sand, but did not reach a final agreement with Donahue. In December, 1926, Mohrman told Buell that plaintiffs were expending moneys to keep the leases alive and Buell assured Mohrman that when the defendant had finished with the Redd well it would start work on the well in Section 15. Early in 1927, Buell told Mohrman that defendant was experiencing some difficulty in completing the Redd well and plaintiffs were at liberty to secure some other person to drill the well in Section 15. Mohrman replied that plaintiffs were looking to defendant to drill such well. On March 22, 1927, Buell told Mohrman that the conditions of the oil market were such as not to warrant the drilling of a wildcat well and that the defendant was not going to drill the well under its contract with plaintiffs. The same day, Krow telegraphed the defendant that he had just learned the defendant had completed the Redd well but was not inclined to drill the well under its contract with plaintiffs; that he hoped defendant would start work under the contract at once. On March 23, Buell telegraphed Krow that he did not believe it advisable to start a wildcat well under existing conditions in the oil industry; that he had advised Mohrman on several occasions that plaintiffs were free to secure another person to drill the well; and that he did not consider plaintiffs bound under the contract.

On April 1, 1927, Krow telegraphed Buell as follows:

"J. Garfield Buell.

"Your contract to drill a well on the southwest quarter of fifteen township twenty-three range five is about to expire. I have spent large sums of money on this contract and expect you to drill this well. Advise me at once when you will start work on this well.
                              "A. D. Krow."

The defendant made no response to the telegram of April 1. Plaintiffs then permitted the McFadden lease to lapse.

Plaintiffs established that the cost of drilling a well to the Wilcox sand would have been between twenty and twenty-five thousand dollars.

By proper motions, both at the close of plaintiffs' evidence and at the close of all the evidence, counsel for the defendant questioned the sufficiency of the evidence to sustain a verdict in plaintiffs' favor. These motions were overruled.

The court instructed the jury that, if it should find for the plaintiffs, the measure of damages should be the reasonable cost of drilling the well, less the expense of casing and permanent improvements that usually remain in a well when it comes in as a producer. Proper exceptions were saved to this instruction.

The jury returned a verdict for $10,000 in favor of the plaintiffs. Judgment was rendered thereon and the defendant has appealed.

■ When defendant repudiated the contract, plaintiffs had an election of remedies as follows: (a) To rescind the contract and recover the value of any performance rendered. (b) To treat the repudiation as an immediate breach and sue at once for any damages which plaintiffs had sustained. (c) To treat the contract as binding and wait until the time for its performance and thereafter bring an action on the contract for its breach. United Press Ass'n v. National Newspaper Ass'n (C. C. A. 8) 237 F. 547, 553; Acme Mfg. Co. v. Arminius Chemical Co. (C. C. A. 4) 264 F. 27; Canada Atl. & P. S. S. Co. v. Flanders (C. C. A. 1) 165 F. 321; Golden Cycle Min. Co. v. Rapson Coal Min. Co. (C. C. A. 8) 188 F. 179.

Counsel for the defendant contend that the telegram of April 1, 1927, constituted an election by plaintiffs to treat the contract as still binding; that the agreements to deliver the leases and the "dry hole" contribution agreements were conditions precedent; that the plaintiffs failed to perform such conditions and permitted the McFadden lease to terminate before the time defendant was required to commence the drilling of the well, under the terms of the contract; and that, because thereof, the contract was discharged and defendant released from liability thereunder.

■ One party to a contract, who is entitled to demand performance of a condition precedent, may waive such performance by acts evidencing such intention, especially where the other party changes his position in reliance upon such waiver. Finlay v. Swirsky, 103 Conn. 624, 131 A. 420, 424; California Raisin Growers' Ass'n v. Abbott, 160 Cal.

601, 117 P. 767, 770; Ashland Coal, etc., Co. v. Hull Coal, etc., Corp., 67 W. Va. 503, 68 S. E. 124; 13 C. J. p. 671; 2 Elliott on Contracts, §§ 1654, 1858, 1860; 5 Elliott on Contracts, §§ 4321, 4175.

We assume, without deciding, that the agreement to assign the leases, within ten days from August 2, 1926, was a condition precedent.

[3] The defendant knew, at the time the contract was entered into, that the McFadden and Paxton leases were in escrow and could not be delivered until the well had been commenced. On August 12, 1926, the defendant accepted assignments of these leases and photostatic copies of the original leases with full knowledge of the facts. It accepted the Glover lease on August 28, 1926. When the time for commencing the well, under the escrow agreement, was about to expire, defendant requested plaintiffs to secure extensions. The plaintiffs expended substantial sums in securing such extensions. From time to time thereafter and up until March 22, 1927, the defendant made statements to plaintiffs which assured them that it would drill the well as soon as the Redd well had been completed. The defendant at no time requested delivery of the leases which were in escrow. When the defendant renunciated the contract, it gave as its sole reason the conditions in the oil industry. We conclude that, if the agreement to deliver the leases was a condition precedent, it was waived so far as the Paxton and McFadden leases were concerned; and as to them it became an ordinary term of the contract to be performed by plaintiffs after the defendant had commenced the drilling of the well in Section 15.

The contract was performed as to the Glover lease.

Counsel for defendant assert, however, that before performance was due on its part, plaintiffs permitted the McFadden lease to lapse and failed to deliver the "dry hole" contribution agreements. We seriously doubt, under the facts, that the promise to deliver such agreements constituted a condition precedent. The parties apparently did not so regard them. No time was fixed for their delivery, no request for delivery was made by defendant and the failure to deliver them was not given as a reason for repudiation. However, assuming but not deciding, that such "dry hole" contribution agreements were to be delivered before the defendant was to be obligated to commence the well, delivery immediately prior to the time defendant commenced the drilling of the well would have

been a compliance with the contract upon the part of plaintiffs.

After the renunciation of the contract by defendant, on March 22, plaintiffs were excused from performing or tendering performance of the contract upon their part, so long as the repudiation was not retracted, and for a reasonable time thereafter. When one party to a contract gives notice to the other party, before the latter is in default, that he will not perform such contract on his part and does not retract such notice before performance on his part is due, such other party is entitled to enforce the contract without previously performing or offering to perform the provisions of the contract upon his part in favor of the former party. Edgar & Son v. Gro. Wholesale Co. (C. C. A. 8) 298 F. 878, 882; U. S. Fid. & Guar. Co. v. Pensacola (C. C. A. 5) 263 F. 344, 347; Weed v. Lyons Pet. Co. (D. C. Del.) 294 F. 725, 732; Russell Miller M. Co. v. McLean, 48 S. D. 198, 203 N. W. 498; Williston on Contracts, vol. III, §§ 1202, 1337; Id., vol. II, §§ 767, 768. The law does not require a vain and idle ceremony. Bank of Columbia v. Hagner, 1 Pet. 455, 467, 7 L. Ed. 219; Allegheny V. B. Co. v. Raymond Co. (C. C. A. 2) 219 F. 477, 482. The rule applies to a condition precedent. Caldwell v. Cockhutt Plow Co., 30 Ont. Law Rep. 244, 257; Williston on Contracts, vol. II, §§ 767, 768.

Mr. Williston, in his work on Contracts, in section 1337, supra, says:

"The rights of a party to a bilateral contract of mutually dependent promises upon an anticipatory repudiation by the other party will then be: (1) To rescind the contract altogether, and if any performance has already been rendered by the injured party, to recover its value on principles of quasi-contract; (2) to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position, or (3) to await the time for performance of the contract and bring suit after that time has arrived. Even if the plaintiff thus elects to wait until the stated time for performance, he will be excused from the necessity of performing or being ready to perform on his own part unless the repudiating party withdraws his repudiation before a change of position by the injured party makes this performance more burdensome. Indeed, the injured party has no right to perform, if, by so doing, damages will be enhanced."

Counsel for the defendant assert that plaintiffs did not elect to treat the renunciation as a breach, but, on the contrary, elected

to treat the contract as binding and after such election breached the contract by permitting the McFadden lease to lapse and by failing to deliver the "dry hole" contribution agreements. We cannot agree with this contention, (1) because there was no retraction of the repudiation, and (2) because, as we shall undertake to show, there was an election, on April 1, 1927, to treat the repudiation as a breach.

The telegram of March 22 was a request for performance by plaintiffs. The reply of March 23 was equivocal but was in no sense a withdrawal of the positive renunciation made by Buell to Mohrman on March 22, 1927. The telegram of April 1, the date the last extension on the McFadden escrow agreement expired, demanded that the defendant advise immediately whether it would retract its renunciation. The reason for this demand is self-evident. Plaintiffs desired to know whether they should undertake to secure an additional extension of the McFadden escrow agreement, by a further expenditure of money. When the defendant failed to reply to this telegram, plaintiffs naturally assumed that the defendant was persisting in its repudiation and therefore, on that date, they elected to treat the repudiation as a breach. We think they had a right to do this. Prior to such election, the defendant had not withdrawn its renunciation nor changed its position to its detriment. Plaintiffs' election was evidenced by the fact that they permitted the McFadden lease to lapse and thereby changed their position to their detriment.

The situation of the injured party, where there has been a breach which does not indicate an intention to repudiate the remainder of the contract, and the situation of the injured party, where there has been a total renunciation of the contract, differs in important particulars. In the former case, the injured party has a genuine election either of continuing performance or ceasing to perform. Bernstein v. Meech, 130 N. Y. 354, 29 N. E. 255. Any act, indicating an intent to continue, will operate as a conclusive election. Williston on Contracts, vol. II, § 688, p. 1330; Id., vol. III, § 1334. On the other hand, where the contract is wholly renounced, there can be no real election between continuation and cessation of performance (section 1334, supra), because, after notice of renunciation, the other party cannot go on and complete an executory contract and sue for any increased damages resulting from his continuing to perform. Edgar & Son v. Gro. Wholesale Co. (C. C. A. 8) 298 F. 878, 882;

13 C. J. 655, § 731; Williston on Contracts, vol. III, § 1298, p. 2347.

A continued willingness upon the part of the injured party to receive performance is an indication that, if the repudiator will withdraw his repudiation, but not otherwise, the contract may proceed. It is not an irrevocable election not to treat the renunciation as a breach. Section 1334, supra. The refusal to retract amounts to a continuation of such renunciation. Zuck v. McClure, 98 Pa. 541. This is especially true in the instant case, because the plaintiffs, on April 1, requested the defendant to give an immediate answer as to whether it would retract.

We are not unmindful that the above statement is contrary to the English doctrine, which is that if the promisee, after receiving the repudiation, demands or manifests a willingness to receive performance "he keeps the contract alive for the benefit of the others as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it." Frost v. Knight, L. R. 7 Ex. 111, 112; Williston on Contracts, vol. III, pp. 2386, 2387.

But this harsh and unreasonable doctrine is modified by the American authorities, at least to the extent that so long as the party who has repudiated, notwithstanding requests for retraction and performance upon the part of the other party, refuses to retract and thus continues his repudiation without justification, the latter, if not in default himself, may still elect to treat the repudiation as a breach. United Press Ass'n v. National Newspaper Ass'n (C. C. A. 8) 237 F. 547; Tri-Bullion Smelt. & D. Co. v. Jacobsen (C. C. A. 2) 233 F. 646; Williston on Contracts, vol. III, § 1334.

Plaintiffs, by their request for performance after the renunciation on March 22, kept the contract open for both parties until April 1. During that period, defendant had the right to withdraw its repudiation and thereby obligate plaintiffs to perform. When it failed and refused to retract, after demand on April 1, it evidenced its intent to continue the repudiation. The situation of the defendant, between March 22 and April 1, 1927, had not changed. Performance upon its part had not become more burdensome. Such being the facts, plaintiffs were free to elect to treat the continued repudiation as a breach

of the contract on April 1, 1927. United Press Ass'n v. National Newspaper Ass'n, supra; Tri-Bullion Smelt. & D. Co. v. Jacobsen, supra.

■ Where, upon repudiation by one party, the other party elects to treat such repudiation as a breach, the latter need not bring his action at once but may evidence his election by other acts. McCowan v. McKay, 13 Man. 590; 13 C. J. p. 653. A change of position by the latter manifesting such election is sufficient, and notice of election to treat the repudiation as a breach is not necessary. Williston on Contracts, vol. III, § 1304; Id., § 1323; Churchill Grain & Seed Co. v. Newton, 88 Conn. 130, 89 A. 1121.

■ Failure to endeavor to secure a further extension of the McFadden lease was a change of position upon the part of the plaintiffs to their detriment, and sufficiently manifested their election to treat the repudiation as a breach on April 1. They were not then in default on their promise to deliver the "dry hole" contribution agreements and were not then unable to deliver the McFadden lease on commencement of the oil well. Such election to treat the repudiation as a breach on April 1, 1927, relieved them of the duty of thereafter tendering such contribution agreements and of keeping the McFadden lease alive.

■ The instruction upon the measure of damages was erroneous, under the holding of this court in Hoffer Oil Corp. v. Carpenter, 34 F.(2d) 589. Counsel for plaintiffs urge that the measure of damages is a question of local law; and that we should follow the decisions of the Supreme Court of Oklahoma. The measure of damages for breach of a contract is a question of general jurisprudence. Clark v. Belt (C. C. A. 8) 223 F. 573, 578; Mitsubishi Shoji Kaisha v. Davis (D. C. N. Y.) 291 F. 882, 884; 25 C. J. p. 849. While the decisions of the Supreme Court of Oklahoma on this question are persuasive, they are not binding upon this court. We refused to follow the Oklahoma rule in Hoffer Oil Corp. v. Carpenter, supra, and we adhere to the rule announced in that case.

Counsel for plaintiffs also urge that special damages, sufficient to support the verdict, were pleaded and proven, and that the case of Hoffer Oil Corp. v. Carpenter, supra, does not cover special damages. It is true that such case does not cover special damages, but the issue of special damages was not submitted to the jury in the instant case. The verdict returned in the instant case was for general damages.

On account of such erroneous instruction, the case is reversed and remanded for a new trial.