ROSENBERG BROS. & CO., Inc.,
Plaintiff,

v.

COMMODITY CREDIT CORPORATION,
Defendant.

No. 30073.

United States District Court,
N. D. California, S. D.

Feb. 25, 1955.

Lloyd W. Dinkelspiel, Edward W. Rosston, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Melville, Ehrlich, Bell & Ehrlich, Washington, D. C., for plaintiff.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., Asst. Atty. Gen. Warren E. Burger, Edward H. Hickey, Carl Eardley, Dept. of Justice, Washington, D. C., for defendant.

HARRIS, District Judge.

Plaintiff, a Maryland corporation engaged in the processing of dried fruits, seeks to recover damages from defendant, Commodity Credit Corporation, for alleged breach of contract. The plaintiff, Rosenberg Bros. & Co., Inc., succeeded to all the assets and assumed all liabilities of the business known as Rosenberg Bros. & Company, a California corporation, on October 21, 1948. Plaintiff has operated the business since the date of its acquisition. The only change in nomenclature is the addition of "Inc." Hereafter plaintiff will be called "Rosenberg." Defendant is a federal corporation which succeeded to the assets of and assumed the liabilities and duties of Commodity Credit Corporation, a Delaware corporation, under the terms of its charter.[1] Hereafter defendant will be referred to as "CCC."

Plaintiff corporation sets forth two causes of action, based upon: (1) An express contract for the sale and purchase of raisins; (2) an implied promise on the part of defendant with respect to the signed agreement for the sale and purchase of raisins.

1. 15 U.S.C.A. § 714n.

The litigation arises out of defendant's activities in the fall of 1947 in connection with the program of the Department of Agriculture in entering the dried fruit market. As the federal foreign aid program diminished following the war and the Armed Forces returned to this country and were discharged, the wartime stimulated raisin industry found itself without a ready market for a large part of its product. Government action appeared to be necessary to save the raisin grower.

On September 5, 1947, the CCC announced a purchase program for dried fruits. The Secretary of Agriculture who was chairman of the board of CCC stated that CCC would purchase 61,000 tons of 1947 crop raisins. He further stated in his announcement that the CCC would purchase only from processors and packers. Finally, he announced that the purchase program did not provide for price support at any given level.[2] The Department of Agriculture hoped that the general purchase program would enable dried fruit growers and processors to establish prices at a fair level. When the CCC made its announcement of purchases it was advised by its own economists that the raisin surplus would be in the neighborhood of 100,000 tons. These same economists believed that unless the government prepared to acquire the entire surplus, the program might well depress the dried fruit market.

In September and October, 1947, the plaintiff, Rosenberg Bros. & Co., entered into contracts with the CCC for the sale of raisins. On October 14, 1947, and subsequent to the second contract, CCC announced a new and radically different program for the purchase of 60,000 additional tons of raisins. These new offers were made not only to packers and processors, but also to producers in the physical possession of raisins. The economic result of the program whereby CCC would purchase the entire surplus of Thompson seedless raisins for 1947 was inevitable. The price for raisins rose substantially.

When plaintiff made its successful bids in September and October on some 14,000 tons of raisins it anticipated a grower price of approximately $110 per ton. This would have enabled it to make a fair profit on its sales to the CCC. After the October 14th change of program the grower price rose above $135 per ton. Plaintiff had made short sales at the time it entered into its contracts with CCC, mainly as a result of the demands of CCC that the large processors, including Rosenberg, participate at the very outset in the announced program. In addition, the short position was made necessary because the 1947 crop of raisins was not yet ready for sale by the growers.

The CCC, through its economist, Mr. S. R. Smith, whose forthright testimony tended to solve some of the complex issues, had recommended *renegotiation* of existing contracts between CCC and processors when the new government purchase program of an additional 60,000 tons had been announced. Under his recommendation packers would have paid growers not less than $135 per ton for natural condition raisings. By *renegotiating* with processors at a higher price, CCC would have enabled them to come out whole and at the same time would have permitted them to compensate growers on a fair basis. The CCC refused to act upon this recommendation.

From September through December of 1947 plaintiff failed to furnish raisins under its contracts with the CCC. Because of the uncertain condition of the market and grower resistance to low prices, plaintiff was unable to acquire raisins in large quantities in the latter part of September and the early part of October. Thereafter the CCC's new purchase program boosted prices so high as to make the acquisition of raisins prohibitive in terms of contractual liabilities.

2. Exhibit No. 4.

The shortage of supplies and the high prices sought by the growers caused the CCC itself to reject all grower bids on November 26th on the ground they exceeded $135 per ton. Packers could not cover their CCC commitments at the exorbitant prices sought by growers.

On November 26th the CCC announced that it would require processors to certify they had paid producers not less than $135 per ton for natural condition raisins. Such requirement constituted the price support of $135 per ton. It may be remembered also, that previous to this marked departure from its program the government announced through CCC that it would purchase directly from the grower.

Plaintiff alleges that such price support, together with the purchase of the additional 60,000 tons of surplus raisins, as well as the acquisition of raisins directly from the grower, constituted both a breach of the terms of CCC's promise to plaintiff, as expressed in the CCC announcement of September 5, 1947, and of an implied condition to refrain from interfering in the market.

During the winter months of 1947 and January of 1948 plaintiff attempted to renegotiate its contract with CCC or, in the alternative, sought to obtain cancellation. It failed in both efforts and on January 21, 1948, plaintiff received a telegram from CCC directing that it comply with the terms of its contracts. This it agreed to do on the following day.

In the course of the next several days certain terms were worked out between CCC and plaintiff as to the waiver by plaintiff of storage charges for the past period while negotiations were pending and by CCC for nondelivery in accordance with the terms of the contracts. By the end of the month plaintiff was shipping raisins in fulfilment of its contract obligations.

Rosenberg has alleged that as a direct and proximate result of CCC's conduct the acquisition of raisins from growers exceeded the normal and anticipated purchase price by $20 to $25 per ton. It is this differential which plaintiff seeks to recover from defendant for the alleged breach of contract.

## The Issues Involved

Defendant contends that the September 5, 1947, press release was no more than that; that it was not a part of the contract with plaintiff nor did it bind the government to remain out of the raisin market for the balance of the growing year. Defendant points to the actual contracts signed by plaintiff and notes that they purport to be complete on their faces, covering all conditions surrounding the sale and purchase of raisins.

The CCC asserts numerous defenses to the two causes of action set forth in the plaintiff's complaint: The answer denies that the press release was incorporated in the contracts;[3] CCC further denies that the purchase of an additional 60,000 tons of raisins constituted an interference with the performance of the contracts. It also asserts that plaintiff suffered no damages as a result of CCC's action.

Among other defenses defendant affirmatively asserts: That the plaintiff is not the real party in interest; that the Federal Tort Claim Act, 28 U.S.C.A. §§ 1346, 2671 et seq., is applicable; that the written contracts alluded to are full and complete in themselves; that estoppel is not the basis for recovery against the United States of America or its agencies; that the suit in substance is one against the United States and it has not waived its immunity; that plaintiff waived its claim for damages.

The basic issue presented by the pleadings arises out of the asserted contract between Rosenberg and CCC. If the press release constitutes part of a basic agreement, then the CCC's subsequent conduct would constitute a breach of the express contract. On the other hand, if the two written agreements

3. CCC Nos. 1647 and 1893.

of September and October are complete in and of themselves, the CCC's later purchase program, including the establishment of a minimum tonnage figure of $135 on November 26, 1947, would constitute a violation of an implied promise not to make more difficult the performance of the contracts by plaintiff.

## The Implied Contract

█ The CCC, on September 5, 1947, made an announcement of its dried fruit purchase program. The announcement embodied three promises: (1) The CCC would purchase a maximum of not more than 61,000 tons of raisins; (2) it would purchase directly from processors and packers of dried fruit; (3) it would not provide price support at any given level. This press release followed study of recommendations by high officials in the Department of Agriculture and suggestions and criticisms made by executives in the processing industry. It culminated efforts on the part of all parties to stabilize the rai-

sin market. The evidence adduced by both sides confirms the background events which preceded the signing of the two written contracts. Grower resistance to the buying program developed in September and continued through October. Pressure on the part of organized raisin growers led to revision of the CCC program. Prior to such revision, the negotiations between the parties pointed to a clear understanding on the part of both sides that the CCC announcement of September 5th expressed the intended future course of conduct on the part of the government. The manifest intention of the CCC inevitably led plaintiff and its fellow processors to bid on the basis of the then existing market level.

It was implied in the very nature of the transaction that the CCC would do nothing to prevent or hinder performance on the part of the plaintiff.[4] The drastic and radical departure of the government policy constituted a breach of the implied agreement with plaintiff.[5]

4. United States v. Peck, 102 U.S. 64, 26 L.Ed. 46; Cf. Bailey v. Railroad Co., 17 Wall. 96, 84 U.S. 96, 21 L.Ed. 611; Merriam v. United States, 107 U.S. 437, 444, 2 S.Ct. 536, 27 L.Ed. 531.

5. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70; also Sunswick Corp. of Del. v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772. The inevitable result of the change in program on the part of CCC through its purchase of an additional 60,000 tons of raisins both from growers and processors meant that those who had bid successfully on the two previous government contracts would be prejudiced because of the sharp increase in the price of raisins. C. S. Smith pointed out to the Department of Agriculture that the processors felt they had been dealt with unfairly. (Plaintiff's Ex. 50)

In his report Mr. Smith recommended renegotiation of existing contracts between CCC and processors covering the 61,000 tons which they had agreed to sell to the government. (Rep.Tr. p. 1146) His recommendation would have permitted packers to pay growers not less than $135 per ton for natural condition raisins, and prices to processors would be modified accordingly. C. S. Smith, who was a most careful witness,

made such recommendation because he believed that renegotiation at a higher level was a fair solution to the problem of both processors and growers. (Rep. Tr. pp. 1356, 1360)

Secretary of Agriculture Anderson rejected the recommendations. (Rep.Tr. p. 1096, 1. 13) ". . . As a business proposition I would not cancel it (the Rosenberg contract), because I felt that a free bid had been made and that those people must abide by their bid." *It is apparent from the Secretary's answer that he considered the contract obligations of a proprietary nature, rather than governmental.* In the course of conversation with Mr. Grady, the Secretary informed Grady, as testified to by the latter, that "he intended to teach the packers a lesson." (Tr. p. 517) In elaboration of this statement he indicated that "You can't buck a four billion dollar corporation." (Tr. p. 518)

In response to questioning by government counsel on the subject of the Secretary's relations with the packers, and in an effort to clarify that relationship, the Secretary testified as follows: (Rep.Tr. p. 1103, 1. 11–16): "Mr. Grady testified some days ago that the controversy was that the newspaper story had said the packers had ganged up on me. That was

■ Defendant suggests that plaintiff assumed the risk of a change in the government program. This is a misapplication of the doctrine of assumption of risk. The parties did not, nor could they, contemplate the possibility of government hindrance or interference with the raisin purchase program as outlined in the September 5th announcement.

The basis of liability is real and compelling. The CCC adopted an unconscionable and wholly indefensible position, while it engaged in a purely proprietary function.[5a] It is not enough to say that CCC as an agency of the United States government was entitled to sovereign immunity.

■ The doctrine of sovereign immunity is not applicable to the facts at large and cannot afford a defense.

■ With respect to the defense of waiver of rights, plaintiff's conduct at the end of January, 1948, in arranging for shipment under the contract requirements did not in itself waive any rights arising by reason of the CCC's breach. The express waiver under the January modification dealt solely with subsidiary matters of storage charges and delayed shipment. Plaintiff preserved its rights. Defendant has the burden of proving waiver, Fed.Rules Civ. Proc. rule 8(c), 28 U.S.C.A., and has not discharged this burden.

■ The series of events leading up to the final shipment of raisins indicate an effort on the part of plaintiff to renegotiate or cancel the contracts. They do not point to waiver. Delivery itself following defendant's breach does not constitute a waiver of a damage claim.[6] Nor did acceptance of payments under the contract constitute a waiver.[7]

In view of the foregoing findings of liability under the second cause of action, it becomes unnecessary for the court to pass upon the first count. The other and separate defenses already alluded to require no specific attention and the court finds the same to be entirely without merit.

## Damages

After submission of the cause and extensive oral arguments, the court reopened the matter for additional discussion on the question of damages. The accounting problems implicit in the record, and the various theories of damage required, in the opinion of the court, additional consideration.

With respect to the basic accounting aspects, that is to say, the arithmetical computation of the purchasing, closed and open orders, invoicing, sales invoice, etc., there has been no disagreement.[8] This work was engaged in through plaintiff's counsel. The problem, however, transcends the ordinary accounting problem for the reason that it is incumbent upon the court to adopt or reject one of a number of different theories espoused by the parties, on a somewhat arbitrary basis.

Counsel submitted a composite exhibit reflecting the following five theories of damage based upon relative costs and areas of purchase: (1) Average market price of $116.16 per ton (lowest market average from December 12th through the end of May, 1948); (2) $120.52 per ton (lowest market average from December 12th through date of actual delivery of raisins); (3) $128.13 per ton (average market level for period October 14, 1947, to the date of final delivery); (4) $129.34 per ton (average market level from June 1, 1947, to the date of final delivery); (5) $134.16

---

not it at all. The statement was that I had said the packers had ganged up on the growers. And he asked me if I made that statement, and I told him that I had, that I believed it to be true. . . ."

5a. Amoskeag Mfg. Co. v. United States, 17 Wall. 592, 84 U.S. 592, 21 L.Ed. 715.

6. Bu-Vi-Bar Petroleum Corp. v. Krow, 10 Cir., 40 F.2d 488, 69 A.L.R. 1295.

7. Blair v. United States, for Use and Benefit of Gregory-Hogan, 8 Cir., 147 F.2d 840.

8. Rep.Tr. Nov. 23, 24, 1954; p. 106, beg. 1.17.

per ton (average market level at which plaintiff contends it purchased raisins after fulfilling civilian commitments).[9]

The government contends that plaintiff was not damaged and in effect is entitled to nothing. However, at the same time, it concedes that the foregoing theories are founded upon a valid, arithmetical background.[10]

The court must analyze plaintiff's loss in terms of certain variables in the raisin market:

Plaintiff was engaged in supplying private buyers, as well as the CCC, with raisins. The product itself is fungible. Plaintiff made no effort to allocate any particular raisins it purchased during the 1947–48 season to commercial or government contracts. Although liable for delivery of raisins under both contracts after entering into the two agreements, plaintiff did not actually acquire raisins in sufficient quantity to fulfill all its obligations nor did it make shipments when requested to do so by CCC during the period commencing October 16th and continuing through December 12, 1947. The grower price was at such a level that fulfilment of the CCC contracts would have resulted in loss to plaintiff during the several months referred to. However, plaintiff did meet its commercial obligations during the period in question. These obligations exceeded many-fold the 14,330 ton liability extending to the CCC.

During the winter months of 1947 plaintiff made extensive and serious efforts to renegotiate the contract with CCC in the light of the changed program. As stated above it was the recommendation of S. R. Smith, Director of the Fruit and Vegetable Branch, Production and Marketing Administration, Department of Agriculture, a man of many years experience, that the government renegotiate its contracts with the processors.[11] Renegotiation of the contracts in view of the equities present would have avoided the present litigation and resulted in a fair termination of the acute problems confronting the parties. However, such proposed renegotiation was arbitrarily rejected by the CCC, leaving the parties to find their remedy, if any, in this forum. Parenthetically, it might be stated that it is understandable that pending a hope for settlement, plaintiff would make no serious effort to cover its contract liabilities by purchasing raisins at a level which would have resulted in greater losses.

By December 12th of 1947 plaintiff had contracted for 75% of its seasonal civilian obligations. Thus it would soon be in a position to acquire raisins for its government contracts. A reduction in the market level at this time would make compliance less costly than at an earlier date. The evidence indicates plaintiff commenced its purchase of raisins from growers during the latter part of December in order to meet its CCC obligations.

When defendant refused to renegotiate and plaintiff received a firm demand on January 21, 1948, to commence deliveries under the two contracts, it agreed to do so as soon as it had consummated certain waiver provisions with CCC. During the months of February and March, 1948, plaintiff made actual deliveries of raisins.

The record does not disclose with precision when plaintiff actually purchased the specific raisins which it delivered to CCC; but by reconstructing plaintiff's raisin business in terms of fulfilment of commercial obligations and acquisition of sufficient quantities to meet government obligations, the court is able to determine, with reasonable accuracy, the actual cost to plaintiff of raisins.

The parties themselves have suggested five theories for measuring damages as noted above, based on variable estimates

See Defendant's Ex. AO, AC and Plaintiff's Ex. 58.

Rep.Tr. Nov. 23, 24, 1954; p. 47, 1. 9, 10.

Plaintiff's Ex. 50.

of actual cost to plaintiff of raisins purchased to fulfill contracts. In all of these theories the parties have assumed a price of $110 per ton as the level at which plaintiff could have purchased raisins in the absence of government intervention in the program. The difference between this figure and the several amounts suggested constitute the differential which establishes the measure of plaintiff's damages.

The procedure which the court believes is commensurate with the actual practices engaged in by plaintiff—practices which did much to mitigate damages and minimize loss suffered—is that of determining the lowest prices paid for the acquisition of raisins during the winter months of the 1947–48 season, beginning December 12, 1947, and concluding March 25, 1948, when shipments under the two contracts in question were completed. This is the period when plaintiff purchased in sufficient quantities to meet its government obligations over and above its commercial contracts.

The comparatively low prices of raisins during this period resulted in an average of $120.52 per ton or a loss to plaintiff of $10.52 per ton. By applying such loss factor to the tonnage contracted for by the CCC and allowing for shrinkage of 6% on raisins purchased from growers the court arrives at a figure of $160,366.88 as the amount of damages to which plaintiff is entitled.

The court in arriving at the foregoing figure has considered the variables: the price actually paid for the raisins purchased, the period of time during which the purchases were made, the level of the market had the government not intervened in the program on October 14, 1947, and the actual margin required by plaintiff in order to come out whole under the government purchase program.

Accordingly, It Is Ordered that judgment be entered in favor of plaintiff in the amount of $160,366.88 together with its costs. Plaintiff is to prepare findings of fact and conclusions of law in accordance with this judgment.